**UNITED STATES of America**

v.

**Dennis S. LEWIS, Defendant.**

**Crim. No. 89–437.**

United States District Court, District of Columbia.

Jan. 17, 1990.

John P. Gidez, Asst. U.S. Atty., Washington, D.C., for plaintiff.

Thomas Abbenante, Washington, D.C., for defendant.

*Memorandum Opinion*

SPORKIN, District Judge.

This case is before the Court on defendant Dennis Lewis' motion to suppress evidence seized by officers assigned to the Narcotics Interdiction Unit of the District of Columbia's Metropolitan Police Department. Defendant contends that the actions taken by the officers violated his constitutional rights.

The Government opposes defendant's motion maintaining that the encounter between the police officers and the defendant did not constitute a seizure under the Fourth Amendment. The Government contends that the defendant consented to the

body search that was performed by the officers.

## FINDINGS OF FACT

Officer Edward Hanson, a detective assigned to the Metropolitan Police Narcotic Interdiction Unit, was the only witness who testified at the hearing held by this Court on December 14, 1989. No testimony or other evidence was offered by the defendant. According to Detective Hanson, the primary function of the Interdiction Unit is to intercept narcotics which are being brought into Washington, D.C., via public transportation systems. Suppression Hearing Trans. at 5 (Dec. 14, 1989).

A central component of the interdiction effort is the random interviewing of travelers who are utilizing public transportation systems such as the bus or train. Detective Hanson testified that when conducting such interviews he approaches an individual who he intends to question. Upon initially coming into contact with a traveler, Detective Hanson identifies himself as a police officer and shows his identification. He then proceeds to ask that individual if he or she minds being asked some questions. *Id.* Detective Hanson further testified that if the individual who was approached agrees to be interviewed Detective Hanson then proceeds to ask questions about his or her travel plans, tickets, and personal identification. *Id.* Detective Hanson testified that if after the interview "I've decided I wish to attempt to search the person, I will ask his permission to either search his luggage or his person." *Id.* When engaging in these interviews, Detective Hanson is always accompanied by other officers.

Turning to the specific facts of this case, Detective Hanson testified that on October 19, 1989, he and two other officers, Sergeant Brennan and Detective Zattau, were on duty at the Greyhound Bus Terminal at Union Station in Washington, D.C. *Id.* at 6. At approximately 12:30 p.m., Detective Hanson and the two other officers boarded bus No. 1662 which had just arrived from New York City. *Id.* at 6–7. All the officers were in plain clothes and their weapons were not visible. *Id.* at 9. According to Detective Hanson, he, on a strictly random basis, then approached the defendant Lewis identified himself as a police officer and asked Mr. Lewis if he would answer some questions. Detective Hanson stated that the defendant agreed to respond to his questions.[1] During the course of this interview, Mr. Lewis provided Detective Hanson with his bus ticket which reflected travel from New York to Richmond. Mr. Lewis also indicated that he had been visiting his mother in New York and was returning home. At Detective Hanson's further request, Mr. Lewis showed the Detective his Virginia driver's license and advised Detective Hanson that he was not carrying any luggage.

Detective Hanson next asked Mr. Lewis if he was carrying any narcotics or weapons. Mr. Lewis responded that he was not. Despite this response, and without any basis for making a request, Detective Hanson sought permission from Mr. Lewis to conduct a complete body search. Detective Hanson testified that Mr. Lewis acceded to this request. Mr. Lewis stood up and Detective Hanson began a pat-down search of his person. While conducting this search, Detective Hanson felt a lump in Mr. Lewis' left sock. Detective Hanson then removed from the sock a packet which contained white powder. This white powder field tested positive for cocaine and it weighed approximately 20 to 22 grams. *Id.* at 8.

Once this packet was discovered, Mr. Lewis was placed under arrest. Subsequently, a small packet, which field tested positive for marijuana, was found in Mr. Lewis' jacket pocket. Detective Hanson further testified that a search of the area beneath or in front of Mr. Lewis' seat resulted in the recovery of a McDonald's bag which was found to contain approximately 781 vials of white rock substance,

---

1. Detective Hanson also stated that the two officers who accompanied him did not participate in the questioning of Mr. Lewis. Those officers moved to the rear of the bus where they had initiated interviews with other passengers on the bus. *Id.* at 10.

50 packets of heroin and other drug-related paraphernalia. *Id.* at 8.

Detective Hanson testified that there is no articulable profile that he uses when determining who to interview. As he stated, "Sometimes I'll just walk up to anyone who may be on the bus and ask to talk to them." *Id.* at 16. When asked by this Court why he had chosen to interview Mr. Lewis, a young black male, Detective Hanson conceded that, "There was nothing in particular that I saw in that man, no articulable thing that I saw that I just walked up to him and asked him if I could search him after identifying myself." *Id.*

## CONCLUSIONS OF LAW

### A. *Fourth Amendment Analysis*

■ The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." The Supreme Court has declared that "the Fourth Amendment protects people, not places." *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). In this case, where the arresting officer testified that he lacked any basis for initially approaching Mr. Lewis on the bus, the issue is whether this contact and questioning amounted to a "seizure" under the Fourth Amendment. The Court of Appeals for this Circuit has recently spoken on the constitutional propriety of citizen and police encounters that are based on something less than probable cause or even articulable suspicion. *See United States v. Winston,* 892 F.2d 112 (D.C.Cir.1989); *United States v. Baskin,* 886 F.2d 383 (D.C.Cir.1989). These cases stand for the proposition that "the Fourth Amendment is not necessarily implicated when a police officer initiates an encounter with a citizen he has no articulable reason to suspect of a crime." *Winston,* 892 F.2d at 117. However, both *Winston* and *Baskin* involved situations where the police approached and questioned individuals who had already exited their chosen mode of transport—train or bus. In both of these cases the individuals involved were not subjected to a body search, only their baggage was inspected. Winston was approached by officers outside of Union Station, and Baskin was approached as he was walking through the open and public concourse of Union Station. In concluding that these citizen and police encounters did not constitute a seizure, the Court of Appeals placed a great deal of emphasis upon the fact that an ordinary citizen, when confronted in a public place by police officers who conduct themselves in a polite and nonaggressive manner, would not feel constrained from walking away. Thus, the crucial question is whether or not "in view of all the circumstances surrounding the incident, a reasonable person [in Mr. Lewis' position] would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980).

Unlike the individuals involved in *Baskin* and *Winston,* defendant Lewis was not approached by police officers in an open and public area. Here, Detective Hanson accompanied by two other officers boarded a Greyhound bus that had temporarily stopped in Washington, D.C., while en route to Richmond, Virginia. Upon entering the bus, Detective Hanson approached Mr. Lewis and identified himself as a police officer. Detective Hanson then began to make inquiries of Mr. Lewis. During the entire course of this questioning, Mr. Lewis was seated and Detective Hanson stood in the narrow bus aisle immediately to the side of the row in which Mr. Lewis was located. Mr. Lewis responded to all of Detective Hanson's questions. In addition, Mr. Lewis showed Detective Hanson his travel ticket and Virginia driver's license. By Detective Hanson's own admission, nothing whatsoever about Mr. Lewis' responses or his identification papers was suspicious. Despite this fact, Detective Hanson proceeded to ask Mr. Lewis if he would submit to a body search.

Although the Court of Appeals has determined that an encounter between the police and a citizen in an open and public space where the citizen is free to walk away or to ignore questions addressed to him does not constitute an improper seizure, the facts

and circumstances involved in this case merit a different conclusion. Because of the cramped nature of the interior of a Greyhound bus and the narrow width of the exit aisle, this Court is convinced that a reasonable passenger who is suddenly confronted by police officers who board the vehicle, begin to ask questions, and review identification papers would not feel free to walk away. The very nature of the encounter between Detective Hanson and Mr. Lewis placed the latter in a position in which he could reasonably believe that he was not free to walk away. To walk away from this encounter, Mr. Lewis, who was waiting for the bus to depart for his Richmond destination, would have had to stand up from his seat, work his way out of the narrow row in which he was situated, and then negotiate his way past Detective Hanson, who was positioned in the narrow exit aisle.[2] In effect, he would have had to leave the bus, give up his seat, and lose his ability to travel to Richmond according to his travel plans. To suggest that Mr. Lewis was objectively free to leave in such circumstances is to stretch reality beyond the limits of constitutional propriety. Because the testimony of Detective Hanson and objective circumstances surrounding his encounter with Mr. Lewis make it clear that the defendant Mr. Lewis "was confined to a particular location," *Baskin,* 886 F.2d at 387, this Court finds that an illegal seizure of Mr. Lewis' person occurred as a result of Detective Hanson's conduct.[3] As the Supreme Court has declared, "This kind of standardless and unconstrained discretion is the evil the Court has discerned when in previous cases it has insisted that

the discretion of the official in the field be circumscribed, at least to some extent." *Delaware v. Prouse,* 440 U.S. 648, 661, 99 S.Ct. 1391, 1400, 59 L.Ed.2d 660 (1979) (citations omitted) (random stops of vehicles to check operator's license and car registration violates Fourth Amendment).

A further distinction between this case and prior cases reviewed by the Court of Appeals exists in the nature and extent of the search which the police conducted. In both *Baskin* and *Winston,* the defendants had consented to a search of their baggage by the police. In this case, Detective Hanson, again without any basis or suspicion, asked Mr. Lewis whether he would submit to a body search. Such a search, as was demonstrated to this Court, is quite extensive and intrusive in nature.

 Because this Court has ruled that Mr. Lewis was improperly seized by Detective Hanson, his subsequent consent to the search of his person did not overcome the taint of the prior illegal police conduct. Consent subsequent to an unconstitutional seizure or detention does not remove the taint unless it can be shown that said consent was "the product of an intervening act of free will." *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *see also United States v. Maragh,* 894 F.2d 415, 419 (D.C.Cir.1990); 3 W. La-Fave, Search & Seizure § 8.2(d), pp. 190–191 (2d ed. 1987). Here, such an intervening event was clearly not present. Thus, Lewis' consent to the body search in no way dissipated the initial taint of his improper seizure by the police.[4]

**2.** Although police officers have the authority to take action short of arrest when they have a reasonable suspicion that criminal activity may be taking place, *Terry v. Ohio,* 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968), Detective Hanson by his own admission even lacked such a reasonable suspicion.

**3.** The Florida Supreme Court faced with almost identical facts recently reached the same conclusion. *Bostick v. Florida,* 554 So.2d 1153 (1989). The state of Florida like the city of Washington has been particularly hard hit by the drug problem. The Justices, therefore, are acutely aware of the needs of law enforcement officials, yet they like myself believe that there

are limits beyond which a free society cannot allow its police to go.

**4.** The "fruit of the poisonous tree doctrine" as applied in *Wong Sun* operates to invalidate not only an involuntary consent but also a consent that is determined to have been voluntary. "This might occur when the pressure upon the person from the prior illegality is not so great that 'his will has been overborne' under the *Schneckloth* voluntariness rule [discussed *infra*], but yet it cannot be said under *Wong Sun* that his consent was 'sufficiently an act of free will to purge the primary taint.'" 3 W. LaFave, § 8.2(d), at pp. 190–91.

Moreover, the record demonstrates that Mr. Lewis' consent was not voluntary. In *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), the Supreme Court ruled that the voluntariness determination "is a question of fact to be determined from the totality of the circumstances." *Id.* at 227, 93 S.Ct. at 2048. The Court went on to note that the "Fourth and Fourteenth Amendments require that consent not be coerced, by explicit or implicit means, by implied threat or covert force. For no matter how subtly the coercion was applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed." *Id.* at 228, 93 S.Ct. at 2048. A review of all the circumstances in this case leads inextricably to the conclusion that any consent to a body search given by Mr. Lewis was not voluntary. Mr. Lewis found himself in a situation in which his exit from the his seat on the bus was inhibited. In addition, he was seated while Detective Hanson stood above him and to his side. After having satisfactorily responded to all the questions put to him by Detective Hanson, Mr. Lewis was next confronted with a request to perform a body search. As the questions advanced by Detective Hanson became increasingly more intrusive, the level of anxiety and duress that pervaded the situation necessarily escalated. This Court is convinced that most citizens would react in this manner given the circumstances present in this case. This is natural reaction that applies equally to those who have something to hide as it does to those law abiding citizens who simply believe that they cannot, given the circumstances, say "No" or otherwise refuse to comply with a police officer's request.

### B. *Fifth Amendment Analysis*

Although this case can be dispensed with on Fourth Amendment grounds, the facts involved are of such concern to me that I believe further examination of the police practices at issue must be made. I am certainly aware of this nation's drug problem and the need to do everything within the limits of the law to eradicate it. Yet,

we cannot become so obsessed with this drug scourge to permit it to dismember the Constitution. It seems rather incongruous at this point in the world's history that we find totalitarian states becoming more like our free society while we in this nation are taking on their former trappings of suppressed liberties and freedoms.

We in this country are law-abiding citizens. We are supportive of our police officers and do not live in fear of them. We do not believe that our police are gestapo agents and are eager to summon their assistance when our physical well being is threatened. Thus, it is perfectly understandable that when police approach an individual soliciting his assistance, he will normally accede to the police officer's request. It is extremely important in our free society to maintain this healthy relationship between the police and its citizens. The police, however, can only maintain this respect if they do not abuse their awesome powers. The police-citizen relationship is based upon certain deep-seated understandings. For example, there is a presumption that the police will normally only accost a citizen in order to discharge normal law enforcement responsibilities. Certainly it is the expectation of the law-abiding citizen that police officers will only approach an individual when there is some legitimate reason or basis to do so. Even in our drug-infested society it is clear that our legal system demands the existence of some cause before a police officer will approach a citizen to determine whether that individual may be engaged in some illicit activity.

No basis at all has been proffered that would legitimatize the approach the police made in the present case. Here we have three policemen entering an interstate bus and randomly approaching passengers to question them about their possession of illicit drugs, all in the guise of assisting the police in their drug interdiction activities. After selecting passengers totally at random and indiscriminately, police approach them and ask them if they are in possession of illegal drugs. When such activity is denied and there being no reason for the

police to disbelieve the negative response, the police as a matter of routine next seek permission to conduct a complete body search of the individual in order to determine whether he or she is telling the truth in his or her denial of drug possession.[5] The citizen, thus, is required to rebut the presumption of innocence and prove the absence of illicit drug activity, a concept clearly contrary to one of our basic Constitutional tenets.

The cases in this area turn on the question of whether there was a voluntary consent to be searched consistent with the Fourth Amendment. I believe the issue is more complex in that these random indiscriminate approaches to citizens and the full body searches that follow also raise profound issues under the Fifth Amendment to the Constitution. Certainly a citizen has the right to be free from a confrontation with a police officer without there being some basis, whether articulable or not, for the police officer's initial approach to the citizen.

■ The random indiscriminate stopping and questioning of individuals on interstate busses seems to have gone too far. If this Court approves such "bus stops" and allows prosecutions to be based on evidence seized as a result of such "stops," then we will have stripped our citizens of basic Constitutional protections. Such action would be inconsistent with what this nation has stood for during its 200 years of existence. If passengers on a bus passing through the Capital of this great nation cannot be free from police interference where there is absolutely no basis for the police officers to stop and question them, then the police will be free to accost people on our streets without any reason or cause. In this "anything goes" war on drugs, random knocks on the doors of our citizens' homes seeking "consent" to search for drugs cannot be far away. This is not America. In my opinion, the Fifth Amendment to the Con-

stitution is transgressed when police officers engage in a concerted planned program that involves random indiscriminate stopping, questioning, and searching individuals with the clear purpose to obtain from their lips and their bodies information and evidence that would incriminate them.[6]

We have, in recent years, tolerated a number of assaults on our freedoms and liberties, all in the pursuit of providing a safer society. We have voluntarily acquiesced in the electronic search of our persons every time we enter a commercial airplane. We permit dogs to sniff our luggage in search of contraband. *See e.g. United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). We even tolerate police road blocks to be established in order to search vehicles for illegal aliens or impaired drivers. *See e.g. United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (fixed checkpoint stops near the border do not violate the Fourth Amendment). All of these incursions on our freedoms have been justified on the basis that they are needed to protect society and do not run afoul of the Fourth and Fifth Amendments because they have been in a sense directly or indirectly consented to by our citizenry.

The "bus stop" however, is different. The specter of passengers riding on a public vehicle of mass transportation being approached by police officers and searched on a strictly random and indiscriminate basis really *does not square with the rights protected under the Constitution.* This deprivation of rights cannot be rationalized on the basis that such means of transportation are utilized largely by the underclass of this nation who, because of greater concerns (such as being able to survive), do not often complain about such deprivations. The Constitution protects all our citizens whether or not they are in a privileged position or indeed even have the desire to

---

5. Detective Hanson testified that although both female and male passengers are subjected to random body searches he did not deem it appropriate to personally conduct a body search of a female.

6. In this case, we are not faced with some renegade police officers pursuing highly questionable practices of their own creation. Rather, it is clear that in pressing this case the Government fully endorses and supports this program of random "consensual" body searches.

protest. Moreover, while the underprivileged might be targeted today, it does not mean that tomorrow such actions will not be directed against others in our society. If this conduct is found to be constitutionally acceptable, the protections we afford our citizens will have been materially abrogated.

It deeply troubles me to allow an alleged drug dealer to avoid prosecution on something other than a substantive basis. If this case represented a matter strictly between the government and an alleged drug dealer on an isolated basis, I would not have many of the concerns I have expressed in this opinion. But, there is much more at stake here. To have any real meaning, this case must stand for the proposition that all of our citizens are entitled to be protected against random indiscriminate confrontations by police. The plain humiliation of our fellow citizens by subjecting them to body searches in cramped quarters in full view of others for no articulable reason is patently offensive. To embarrass individuals by exposing some of their most intimate personal effects without any justification is not tolerable. "We are not impressed by the argument that law enforcement methods such as those under review are necessary to uphold our laws. The Constitution proscribes such lawless means irrespective of the end.... Under our constitutional system, courts stand against any winds that blow as havens of refuge for those who might otherwise suffer because they are helpless, weak, outnumbered, or because they are non-conforming victims of prejudice and public excitement." *Chambers v. Florida,* 309 U.S. 227, 240–41, 60 S.Ct. 472, 479, 84 L.Ed. 716 (1940).

Some say the law-abiding citizen need not fear these approaches by the police, since they really do not curtail the activity of the honest citizen. This is an unacceptable rationalization. It must be realized that it is the law-abiding citizen who readily accedes to the policeman's "search" request to demonstrate that he has nothing to hide. Although the law-abiding citizen can be instructed to just say "No" to a police officer's patently offensive request, he should not be placed in the posture of having to deny those who are there to protect him. Nor should the citizen be placed in a catch–22 position in which some might argue that a negative response in itself creates the necessary articulable suspicion to permit a more in depth inquiry by the police. In such circumstances, it is not too difficult to envision a non-cooperating citizen being placed on a list for subsequent questioning at the next "bus stop."

Police officers have ample weapons to deal with the drug problem and need not resort without cause to indiscriminate approaches and body searches to carry out their important drug interdiction activities. Certainly with the use of profiles, judicious application of the articulable suspicion doctrine, and trained drug-sniffing dogs the police can effectively target the persons they want to interview. The random indiscriminate approach resorted to in this case is inconsistent with our constitutional values. The Supreme Court of Florida recently condemned these abhorrent police practices in these particularly appropriate words:

> The evidence in this cause has evoked images of other days, under other flags, when no man traveled his nation's roads or railways without fear of unwarranted interruption, by individuals who had temporary power in the Government. The spectre of American citizens being asked, by badge-wielding police for identification, travel papers—in short a raison d'etre—is foreign to any fair reading of the Constitution, and its guarantee of human liberties. This is not Hitler's Berlin, nor Stalin's Moscow, nor is it white supremacist South Africa....

*Bostick, supra* (quoting, *State v. Kerwick,* 512 So.2d 347 (Fla. 4th DCA 1987) (opinion of Andrews, J.).

We must not allow the exigencies of the times to countenance a bending of the Constitution. By now, we should have learned from our unfortunate experiences with the Japanese internment camps of World War II, and the McCarthy era of the 1950's, that the Constitution must not be compromised

to deal with the nation's problems of the day.

The evidence seized by the officers involved in this case will be suppressed.