**UNITED STATES of America, Plaintiff,**

v.

**Aaron A. FELDER, Defendant.**

**Crim. A. No. 89–492.**

United States District Court,
District of Columbia.

March 7, 1990.

Elizabeth H. Danello, Asst. U.S. Atty., Washington, D.C., for plaintiff.

Alan G. Warner, Washington, D.C., for defendant.

## MEMORANDUM OPINION

SPORKIN, District Judge.

This case is before the Court on defendant Aaron A. Felder's motion to suppress evidence seized from his person and his property on December 1, 1989. The defendant contends that the actions of Metropolitan Police Department's Narcotic Interdiction Unit violated his constitutional rights. The Government opposes the defendant's motion maintaining that defendant's encounter with members of the Metropolitan Police Department's Narcotic Interdiction Unit did not violate defendant's Fourth Amendment rights.

## FINDINGS OF FACT

At a hearing on February 8, 1990, the Court heard testimony from Detective Edward Hanson of the Metropolitan Police Department's Narcotic Interdiction Unit and the defendant. Michael L. Kane, a private investigator, also testified on the defendant's behalf.

This case involves another in a series of "bus stops," in which members of the Metropolitan Police Department's Narcotic Interdiction Unit board buses stopping in Washington, D.C. in order to intercept drug smugglers coming from other cities. *See e.g., United States v. Cothran,* 729 F.Supp. 153 (D.D.C.1990); *United States v. Lewis,* 728 F.Supp. 784 (D.D.C.1990). Det. Hanson testified that members of the Narcotic Interdiction Unit routinely interview travellers to intercept narcotics which are being smuggled into Washington, D.C. from "source cities" via public transportation. Det. Hanson testified that members of his unit will actually board buses and trains to question passengers rather than confining their interviewing activity to passengers after they have arrived in Washington, D.C. and exited from the bus or train.

According to Det. Hanson, there is no articulable profile he uses in determining which passengers to interview. Interviewees are simply selected at random. Det. Hanson is unaware of any written policy concerning the "bus stops," but testified that he and other members of his unit have been instructed to board buses in order to interview passengers. Since this program has been in existence, Det. Hanson testified that he has interviewed approximately 50 passengers on board buses, and about 35 passengers on board trains. Of these 85 passengers, Det. Hanson could recall only 3 or 4 occasions in which passengers had refused to consent to an interview. According to Det. Hanson, when passengers who appear nervous refuse to consent to an interview, certain members of his unit then take it upon themselves to notify authorities at the next stop.[1] These "refuseniks" may then be approached again, by officers further down the line, in order to obtain their consent to undergo a search for drugs.

Turning to the facts of this case, Det. Hanson testified that on December 1, 1989, he and two other officers of the Metropolitan Police Department's Narcotic Interdiction Unit were on duty at the Greyhound Bus Terminal at 1005 1st Street, N.E. At approximately 9:05 p.m., all three officers boarded Greyhound bus number 1793 which had recently arrived from New York City. The ultimate destination of the bus was not D.C., but rather points further south. All three officers were in plain clothes and their weapons were not visible. Many of the passengers had already left the bus by the time the officers boarded, but approximately six to ten passengers were still on board.

The defendant testified that when the three officers boarded the bus, two officers, including Det. Hanson, walked to the rear of the bus while one officer remained up front to use the intercom system by the driver's seat to make an announcement. The defendant could not recall the precise content of the announcement, but remembered that the announcement identified the officers as members of the Narcotics Interdiction Unit. Det. Hanson testified that when members of his unit boarded buses, officers would, at times, make announcements over the loudspeaker of the bus of the presence of members of the Metropolitan Police Department.[2] According to Det. Hanson, there is no fixed policy concerning the announcements or their contents, and different officers might make different statements. Det. Hanson testified that an officer would usually announce that D.C. had a drug problem, that the Narcotics Interdiction Unit was concerned with pre-

---

1. Det. Hanson testified that he had never done this himself.

2. Det. Hanson was unable to recall whether such an announcement was made in this case, but conceded that it was possible. The Court credits the uncontradicted testimony of the defendant that an announcement was made. The Court also credits the testimony of the defendant that an officer remained at the front of the bus, by the only exit, to make the announcement.

venting drugs from coming into D.C., and that as part of the drug interdiction program officers would be interviewing individual passengers. The officer making the announcement would request the passengers' cooperation. Based upon the uncontradicted testimony of the defendant, the Court finds that such an announcement was made in this case and that the police officer who made the announcement remained by the front door of the bus while various passengers on the bus were being approached, questioned, and searched.

After the announcement was made, Det. Hanson approached the defendant who was sitting in an aisle seat on the driver's side of the bus. Det. Hanson testified that there was nothing in particular that drew his attention to the defendant, a 23 year old black male, and that he approached the defendant on a strictly random basis. He identified himself as a police officer and began to speak to the defendant in a low, conversational tone. Det. Hanson first asked to see the defendant's bus ticket. The defendant took the ticket out from a bag sitting on the floor between his feet and gave it to Det. Hanson. The ticket indicated that the defendant was travelling from Newark, New Jersey to Petersburg, Virginia. Det. Hanson returned the ticket to the defendant and asked if he had any identification. The defendant replied that he did not.

Det. Hanson then asked if he could search the bag resting between the defendant's feet. The defendant testified that at this point he did not feel free to leave and did not realize that he could refuse to comply with Det. Hanson's requests. The Court credits defendant's testimony that because Det. Hanson was blocking his path to the aisle, he would have been unable to exit the bus without coming into physical contact with the officer unless Det. Hanson had turned sideways to allow the defendant to pass through the narrow aisle. Rather than answer Det. Hanson's question immediately, the defendant instead gave Det. Hanson misinformation about his background and his destination.[3] Det. Hanson testified that he asked and received permission from the defendant to search his bag. The defendant denies that he gave the officer permission to search and testified instead that he merely moved his bag into the aisle when Det. Hanson motioned that he turn his bag over to him. While the circumstances surrounding this encounter are ambiguous, based upon my assessment of the credibility of the witnesses, I find that the defendant did not refuse to have his bag searched and that his "yes, sir" response to Det. Hanson's request for permission to search his bag was understandably taken by Det. Hanson as permission to conduct the search. After the defendant moved the bag into the aisle, Det. Hanson took the bag, placed it on the seat, and proceeded to search it. According to Det. Hanson, at this point, the defendant began to shake uncontrollably.

Det. Hanson drew a sweatshirt out of the bag that had an insignia of the L.A. Raiders. He handed the sweatshirt to the defendant and asked him if he was a Raider's fan. The defendant replied that he was not. Det. Hanson continued with his search of the bag. Inside the bag, he discovered a plastic bag containing two smaller plastic bags—one of which contained white powder that later field tested positive for cocaine powder, and the other of which contained a white rock substance that later field tested positive for cocaine base.[4] The defendant was then placed under arrest. In a pat down search of the

---

**3.** While Det. Hanson did not include this conversation in his chronology of events, he did recall that the defendant began to "mumble" after he asked to search his bag. The defendant testified that in an effort to forestall a search of his bag, he began to tell the officer admitted lies about himself. The defendant further testified that he believed the officer might not have asked to search his bag if he had been able to provide identification and he thought that providing information about himself would make the search unnecessary. The defendant candidly testified that the information he gave about his background and destination were untrue. The Court credits the testimony of the defendant with regard to the conversation.

**4.** Subsequent DEA analysis determined that the white powder contained 42.9 grams of cocaine hydrochloride and the rock substance contained 45.1 grams of cocaine base.

defendant after his arrest Det. Hanson discovered a small packet of greenish weed substance later determined to be marijuana.

Michael L. Kane, a private investigator, testified that Greyhound bus number 1793 was a 2000 series bus and that he had measured and photographed the interior of a bus from this series. According to Mr. Kane, the width of the aisle in a 2000 series bus is approximately 14 inches.

## CONCLUSIONS OF LAW

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable search and seizures, shall not be violated ..." The Supreme Court has declared that "the Fourth Amendment protects people, not places." *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). The issue in this case is whether Det. Hanson's approach and questioning of the defendant on the bus, which was conducted on a strictly random basis, amounted to a "seizure" under the Fourth Amendment.

A seizure occurs when a citizen's liberty is restrained by a police officer through physical force or a show of authority. *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968). Whether the defendant was seized depends on the totality of the circumstances. *Michigan v. Chesternut,* 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988). The question is whether "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct.

1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.). The subjective beliefs of the person approached are irrelevant to whether a seizure has occurred. *United States v. Winston,* 892 F.2d 112, 115–16 (D.C.Cir.1989); *United States v. Carrasquillo,* 877 F.2d 73, 76 (D.C.Cir.1989). Rather the test assumes a reasonable citizen "innocent of any crime." *Gomez v. Turner,* 672 F.2d 134, 140 (D.C.Cir.1982).

The Court of Appeals for this Circuit has held that "the Fourth Amendment is not necessarily implicated when a police officer initiates an encounter with a citizen he has no articulable reason to suspect of a crime." *Winston, supra* at 117; *See also United States v. Baskin,* 886 F.2d 383 (D.C.Cir.1989). As this Court noted in *United States v. Lewis, supra,* both *Winston* and *Baskin* were cases in which the police approached and interviewed individuals after they had deboarded their trains and were walking in the open and public concourses in and outside of Union Station. In both cases, the Court held that under the circumstances a reasonable person would have felt free simply to walk away from the officer and, therefore, a seizure did not take place.[5]

■ As I stated in *Lewis,* I do not believe that a reasonable person would feel free to leave under the circumstances of a "bus stop," in which officers board a narrow, cramped bus en route to another destination in order to randomly question passengers. *Id.* at 787. This case differs from *Lewis* in several respects: the defendant was not asked if he was carrying drugs in this case nor was he subjected to a full body search prior to his arrest. None-

---

**5.** The government relies heavily on *United States v. Tavolacci,* 895 F.2d 1423 (D.C.Cir. 1990). In *Tavolacci,* Judge Williams, writing for the Court, held that if the initial encounter between the police and the defendant, an Amtrak passenger, amounted to a seizure the officers would not have had the reasonable suspicion necessary to justify such a *Terry* stop. *Id.* at 1424. Judge Williams went on to hold that the encounter between the officers and the defendant, which took place by the doorway of a train roomette, did not constitute a seizure. *Id.* at 1425. Judge Mikva, though concurring in the judgment, did not join in this part of the opinion. *Id.* Judge Edwards, the third member of the panel, dissented. Thus, the precedential value of *Tavolacci* is unclear. Nevertheless, this Court is convinced that the instant case differs significantly from the circumstances in *Tavolacci.* Unlike the defendant in *Tavolacci,* Mr. Felder could not have ended the conversation between himself and the officers by simply stepping back and shutting a door or by walking to another part of the train. Moreover, the conduct of the officers in the instant case signified an intent to prevent the defendant from leaving the bus. *Id.* at 1425.

theless, I believe that the encounter between Det. Hanson and the defendant constitutes a seizure under the Fourth Amendment. Indeed, the record in this case more fully demonstrates that "a reasonable person would conclude from the circumstances, and the show of authority, that he was not free to leave the officer's presence." *United States v. Brady*, 842 F.2d 1313, 1314 (D.C.Cir.1988).

■ First, when the three officers boarded the Greyhound bus, and made their announcement over the intercom system to announce their presence and the purpose of their visit they had in effect "seized" the bus. The passengers, not being advised to the contrary, clearly had to believe they could not leave the bus until they had acceded to the officers' requests and cooperated with the interdiction program. The sudden appearance of three D.C. police officers where one officer planted himself at the bus's only exit along with the use of Greyhound's equipment to announce the official nature of their presence could only suggest to the passengers that the officers had taken control of the bus. Indeed, these actions seem designed to convey the impression that passengers were not free to leave the bus.[6] Such a display of official police authority would clearly have an intimidating effect on these passengers.

Moreover, when Det. Hanson approached the defendant, who was sitting in his seat, there was one officer standing behind him at the back of the bus and another officer standing in front, by the door of the bus. Thus, the defendant would have had to extricate himself from his seat and negotiate his way in the 14 inch aisle past both Det. Hanson and the officer standing in the front of the bus, by its only exit, in order to walk away from the encounter. Given Det. Hanson's location and the narrow width of the aisle, it would have been impossible for the defendant to walk past Det. Hanson without any physical contact unless the officer was willing to move or turn side-

ways. Under these circumstances, it is clear that the defendant "was confined to a particular location." *United States v. Baskin*, 886 F.2d 383, 387 (D.C.Cir.1989).

Finally, Det. Hanson testified that a passenger who refused to consent to an interview might be considered suspicious simply for refusing consent and, therefore, some members of the Narcotic Interdiction Unit might notify authorities at the next stop and provide a description of the uncooperative passenger. As Judge Gesell has noted, this practice could result in further scrutiny and questioning at every stop:

> Any reasonable person would feel less than free to refuse a police search if aware that refusal to cooperate would lead to repeated harassment. As the hour became late, police in every city down the line could board the bus and wake the uncooperative passenger.

*Cothran, supra* at 156.

Because the defendant was improperly seized by Det. Hanson, his subsequent consent to the search of his bag did not overcome the taint of the prior police conduct. *United States v. Maragh*, 894 F.2d 415, 419–20 (D.C.Cir.1990). Only when the subsequent consent is "the product of an intervening act of free will" can it "purge the primary taint of the unlawful invasion." *Wong Sun v. United States*, 371 U.S. 471, 486, 83 S.Ct. 407, 416–17, 9 L.Ed.2d 441 (1963). Because such an intervening event was not present in this case, the defendant's consent to the search of his bag did not dissipate the initial taint of his improper seizure by the police.

■ Moreover, the record demonstrates that the defendant's consent was not voluntary. "Voluntariness is a question of fact to be determined from the totality of circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973). After reviewing the totality of circumstances in this case, the Court concludes that the defendant's consent was not voluntary. At

---

**6.** The test as to whether a seizure has occurred is an objective one, "police intentions are relevant 'to the extent that [they have] been conveyed to the person confronted' since the in-

quiry turns on the *perceptions* of the reasonable person." *Tavolacci, supra* at 1425 (quoting *Chesternut*, 108 S.Ct. at 1980 & n. 7).

the time of the questioning, the defendant was confined in his seat with two officers preventing his exit. Det. Hanson stood in the aisle next to him and another officer stood in the front of the bus by the only exit. The officers had just made an announcement over the loudspeaker which suggested that they had assumed control of the bus. The Court is convinced that a reasonable person, innocent of any crime, would not have felt capable of saying "No" under these circumstances.

Although I am deeply troubled by the prospect that an alleged drug dealer may go free on the basis of a procedural ruling rather than a substantive jury verdict, the strictures of the Fourth Amendment are not mere technicalities, but important constitutional safeguards that protect all citizens. Police practices must be designed to conform to the Fourth Amendment; a citizen's constitutional rights cannot be twisted to conform to current police practices.

As I stated in *Lewis*, the police practice of boarding buses and randomly approaching passengers to question and search them without any articulable suspicion is repugnant to this nation's constitutional values and safeguards as embodied not only in the Fourth Amendment, but also in the Fifth Amendment. Other constitutional protections may also be involved. The First Amendment guarantee of the right to freely assemble and the interstate commerce clause may also be implicated by the police conduct in question.[7] Det. Hanson and the other officers involved in this case are not renegade officers; instead they acted pursuant to an official police practice of boarding buses to approach and search passengers randomly without any particular-

ized suspicion and subjecting those passengers to future stops simply because they exercised their constitutional right to say "No." I do not believe that such a practice meets the requirements of the Constitution. Our desire to overcome the scourge of drugs cannot override the constitutional guarantees that generations of Americans have fought so hard to protect.

This case presents issues that go well beyond an isolated instance between an alleged drug dealer and a police officer. At stake here are the rights of a large segment of our populace. While I realize that the drug epidemic is of tremendous proportions, it cannot be said that everyone who boards an interstate bus must be deemed a suspected drug courier. I know of no precedent where a program as intrusive as this one has been upheld. No case has been made that the only way we can stamp out the drug scourge is for our local police to in effect "seize" buses engaged in interstate transportation in order to indiscriminately search travellers and their possessions. The police must not be allowed to initiate programs of this kind without taking into account the severe impact their actions might have on the constitutional rights of our citizens.

Accordingly, the evidence seized by the officers involved in this case will be suppressed.

---

7. *See e.g., Shapiro v. Thompson*, 394 U.S. 618, 630 & n. 8, 89 S.Ct. 1322, 1329 n. 8, 22 L.Ed.2d 600 (1969). *See also Crandall v. Nevada*, 73 U.S. (6 Wall.) 35, 18 L.Ed. 744 (1867) (inherent right to individual travel between states violated by state statute which imposed railroad tax for every passenger carried out of state). As Justice Douglas noted in *Aptheker v. Secretary of State:*

> Free movement by the citizen is of course as dangerous to a tyrant as free expression of ideas or the right of assembly and it is therefore controlled in most countries in the interests of security. That is why riding boxcars carries extreme penalties in Communist

lands. That is why the ticketing of people and the use of identification papers are routine matters under totalitarian regimes, yet abhorrent in the United States.... This freedom of movement is the very essence of our free society setting us apart. Like the right of assembly and the right of association, it makes all other rights meaningful ... Once the right to travel is curtailed, all other rights suffer, just as when curfew or home detention is placed on a person.

378 U.S. 500, 519–520, 84 S.Ct. 1659, 1671, 12 L.Ed.2d 992 (1964) (Douglas, J. concurring.)