**UNITED STATES of America**

v.

**Bertsfield SMITHEN and John Hoffman a.k.a. John Joseph, Defendant.**

**Crim. No. 90–125.**

United States District Court, District of Columbia.

May 25, 1990.

---

**16**

Thomas J. Hilbarger, Asst. U.S. Atty., Washington, D.C., for U.S.

Gregory English, Alexandria, Va., for defendant Hoffman.

Thomas F. Dunn, Arlington, Va., for defendant Smithen.

## MEMORANDUM OPINION

SPORKIN, District Judge.

This matter is before the Court on defendant Bertsfield Smithen's motion to suppress physical evidence. Co-defendant John Hoffman filed a "motion to adopt" Smithen's motion to suppress. This motion was granted by the Court. Accordingly, the Court treats the motion before it as a joint motion of the defendants to suppress. Defendants contend that the evidence

seized from them must be suppressed because it resulted from an unconstitutional seizure. The Government argues that the encounter between police officers and the defendants did not rise to the level of a seizure and that the evidence obtained was the product of a consensual search.

### FINDINGS OF FACT

On the afternoon of February 14, 1990, two Amtrak Police officers were working Penn Station in New York City. These officers were responsible for approaching individuals whom they believed were possibly carrying narcotics. The two officers working Penn Station were Captain Steven Goldstein and Captain Robert Sauve. These officers testified that because of Amtrak's limited funds on certain days of the week it is their policy just to approach individuals in New York and to ask some limited questions. On these limited approach days, no searches are conducted but if an officer's suspicions are aroused about particular passengers he may "call down" to other stations along the train's scheduled route to advise the officers at those locations that it may prove fruitful to conduct further interviews of those passengers.

Captain Goldstein and Captain Sauve testified that on the afternoon of February 14, 1990 (a limited approach day), they observed two young males walking together through the main concourse area of Penn Station. They observed these two individuals speaking with each other and saw them approach the ticket counter area. The officers further stated that their attention was drawn to these two individuals because they were exhibiting "nervousness." The officers continued to observe these two individuals and saw them go to a boarding gate and heard them ask which train was headed to "Charlottesville." The individuals then boarded the train and proceeded to sit 5–7 rows apart from one another.

The officers decided to approach these two individuals to ask them some questions. Each of the two yet unidentified males was approached separately by one of the officers. Captain Goldstein stated that

he approached an individual whom he came to identify as John Joseph (later determined to be John Hoffman). Captain Goldstein identified himself as an Amtrak police officer and asked the individual if he would mind answering a few brief questions. The individual assented. Captain Goldstein then asked the individual where he was traveling and requested to see his ticket. The individual stated that he was going to "Charlottesville" and produced a ticket in the name of "John Joseph." Captain Goldstein next inquired of Mr. Joseph whether he was travelling alone and if he was carrying any luggage. Mr. Joseph stated that he was traveling alone and was carrying a bag. Captain Goldstein then thanked Mr. Joseph for his cooperation and exited the train.

Captain Sauve approached the second yet to be identified male who he and Captain Goldstein had observed earlier. Captain Sauve had a conversation with this individual during which he learned that his name was Bertsfield Smithen, that he was travelling alone, and that he was carrying a bag. Captain Sauve testified that he never searched any of Mr. Smithen's belongings, never touched Mr. Smithen, and that after speaking with Mr. Smithen he simply exited the train.[1]

Later that evening at approximately 6:05 p.m., officers of the District of Columbia Metropolitan Police and the Amtrak Police boarded the train upon its arrival at Union Station from New York City. The officers had received information from Captains Goldstein and Sauve that two individuals who were travelling in coach # 1940 would be "worth interviewing." The New York officers provided descriptions and the names of these two individuals.

According to Amtrak investigator Sergeant Lawson, approximately five (5) officers boarded coach # 1940. Those officers were as follows: 1) Amtrak investigator Thomas Cook; 2) Metropolitan Police Officers Vance Beard; 3) Edward Hanson; 4) Centrella; and 5) himself. The train was dark at the time the officers boarded because the engine was being switched from an electric to a diesel. There was some emergency or auxiliary lighting on the train but the lighting was quite dim. Lawson testified that some of the officers were carrying flashlights at the time they boarded the train.

Once on board, Detective Hanson encountered the defendant John Hoffman (John Joseph). Detective Hanson approached from behind the seat where Mr. Hoffman was situated. Detective Hanson, who was wearing plain clothes and whose service revolver was not visible, identified himself as a police officer and asked Mr. Hoffman if he could speak with him. Hoffman agreed. Hanson requested to see Mr. Hoffman's train ticket and some identification. The defendant complied with this request, however, the ticket he was carrying was in the name of "John Hoffman" while the New York identification card he produced was in the name of "John Joseph." When questioned about this apparent inconsistency, the defendant responded that his brother who had a different father had purchased the ticket for him.

Hoffman also told Detective Hanson that he was travelling to "Charlottesville, North Carolina" and that he was carrying some luggage. Detective Hanson proceeded to explain to Mr. Hoffman that he was assigned to the Drug Interdiction Unit and that there was a problem with individuals bringing narcotics into the city via the train. Detective Hanson next asked Mr. Hoffman if he was carrying any drugs. Mr. Hoffman responded that he was not. Detective Hanson then asked for permission to search Mr. Hoffman's bag. Mr. Hoffman replied that Detective Hanson could search the bag. After obtaining consent, Detective Hanson began to search the red duffel bag that Hoffman had identified

---

1. Defendant Smithen testified to very similar facts. However, Smithen stated that Captain Sauve took his bag without his consent and conducted a search at a location behind where he was seated. This Court credits the testimony of Captain Sauve. Sauve and Goldstein testified that it was not their policy to search bags on the day in question. They simply conducted limited interviews and if they believed further investigation was required they would "call down" to officers at scheduled stopping points for the train.

as his luggage. Once inside the bag, Hanson observed a pair of "Bugle Boy" tennis shoes with socks stuffed inside. Upon closer examination of the socks, Detective Hanson discovered three large plastic bags secreted inside of the socks. These bags contained approximately 381 small ziplock bags each containing a white rock-like substance that field tested positive for cocaine.

At approximately the same time, Metropolitan Police Detective Vance Beard approached the defendant Bertsfield Smithen, identified himself as a police officer, and asked if he would mind speaking to him. Smithen agreed to speak with Detective Beard. At the time that Detective Beard approached, Smithen was seated at a window seat and there was another female passenger seated next to him. In order to facilitate the conversation between Smithen and Hanson, Amtrak Investigator Cook requested that the female passenger relocate to a seat across the aisle. Once this was accomplished, Detective Beard asked Mr. Smithen for his train ticket. Smithen replied that he had a ticket, and proceeded to stand up to retrieve a blue travel bag from the luggage compartment. He placed the travel bag on the empty seat next to him, opened the bag, retrieved the ticket from within and handed it to Detective Beard. The ticket reflected travel from New York to Charlotte, North Carolina. Smithen told Beard that he lived in New York and was going to visit relatives in North Carolina for two weeks.

Detective Beard then told Mr. Smithen that he was assigned to the Drug Interdiction Unit and that his job was to speak with individuals travelling through Washington in an attempt to stop the flow of drugs into the city. Beard next asked Smithen if he was carrying any drugs in his blue travel bag. Smithen responded that he was not. Beard then asked Smithen if he could

search his bag, in response Smithen offered his bag.[2] Upon examining the bag, Detective Beard found on top of some clothing a "DIAL" deodorant can. Detective Beard took the can out of the bag and twisted off the bottom.[3] Inside of the false bottomed can, he recovered two large plastic bags which contained several small yellow ziplock bags containing a rock-like substance. One of the large bags contained 179 small ziplock bags the white rock-like substance contained therein field tested positive for cocaine. The second bag contained 122 small bags of white powder that field tested positive for cocaine. One of the bags also contained another 69 small bags of white powder that field tested positive for cocaine. Additionally, the arresting officers recovered from the defendant's crotch area a small bag containing a green weed substance that field tested positive for marijuana.

## CONCLUSIONS OF LAW

■ The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." The Supreme Court has declared that "the Fourth Amendment protects people, not places." *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). In this case, the issue is whether the approach and questioning by police officers of a citizen who is travelling on board a train amounts to a "seizure" under the Fourth Amendment.

■ A seizure occurs when a citizen's liberty is restrained by a police officer through the exercise of physical force or a show of authority. *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968). Whether an individual

---

**2.** Defendant Smithen testified that he never consented to the search of his bag and that Hanson simply reached over and began searching. Additionally, he testified that although his bag contained a "DIAL" can it was a can that actually contained deodorant and which was capable of being used. The Court credits the testimony of Detective Hanson as to the sequence of events which led to his searching Smithen's bag.

**3.** Detective Beard testified that these "false bottom" duplicates of legitimate commercial products are sold on the market to travellers who want a place to hide valuables such as jewels or money. He further testified that these containers are often used to transport illegal narcotics.

is seized must be evaluated in light of the totality of the circumstances. *Michigan v. Chesternut,* 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988). Thus, the central question is whether "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). The subjective beliefs of the person who is approached are irrelevant to whether a seizure has occurred. *United States v. Carrasquillo,* 877 F.2d 73, 76 (D.C.Cir.1989).

The Court of Appeals for this Circuit when evaluating the constitutional propriety of citizen and police encounters that are based on something less than probable cause has held that "the Fourth Amendment is not necessarily implicated when a police officer initiates an encounter with a citizen he has no articulable reason to suspect of a crime." *See United States v. Winston,* 892 F.2d 112, 117 (D.C.Cir.1989); *United States v. Baskin,* 886 F.2d 383, 386–87 (D.C.Cir.1989). In concluding that these citizen and police encounters did not constitute a seizure, the Court of Appeals placed a great deal of emphasis upon the fact that an ordinary citizen, when confronted by police officers who conduct themselves in a polite and nonaggressive manner, would not feel constrained from walking away. Most recently, the Court of Appeals has unequivocally declared, "an encounter between a police officer and a citizen, involving no more than approach, questioning, and official identification, does not constitute a seizure and does not require probable cause, articulable suspicion, or any other 'kind of objective justification.'" *United States v. Smith,* 901 F.2d 1116, 1118 (D.C.Cir.1990) (citations omitted).

This Court, however, has ruled in the past that the practice of several officers boarding a bus, blocking the aisle and exit, and randomly questioning people and asking them to submit to a search of their persons rises to the level of a seizure. *See United States v. Felder,* 732 F.Supp. 204 (D.D.C.1990); *United States v. Lewis,* 728 F.Supp. 784 (D.D.C.1990). The Court of

Appeals has treated the confines of a train compartment differently. Specifically, the Court has held that a seizure does not occur when officers approach at the entry door of a train roomette. *United States v. Tavolacci,* 895 F.2d 1423, 1425 (D.C.Cir. 1990) (noting that in such an instance an individual is free to walk to another part of the train or to simply close the door and end the conversation). The Court of Appeals has unequivocally stated, "It [is] also perfectly lawful for the agents to approach the defendant on the train and ask him if he [is] willing to answer some questions, whether or not the agents had reasonable suspicion." *Carrasquillo,* 877 F.2d at 76, citing *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1323–24, 75 L.Ed.2d 229 (1983). Here, Detectives Hanson and Beard did nothing more than this when they approached the defendants. Given the facts, this Court concludes that neither defendant was unlawfully seized.

██ Although not directly raised in the defendants' motion to suppress, this Court feels compelled to address the voluntariness of the consent that was given by the two defendants to search their bags. Having already ruled that the defendants were not illegally seized, the limited question presented is whether the consent, if any, was voluntarily given. In *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), the Supreme Court ruled that the voluntariness determination "is a question of fact to be determined from the totality of the circumstances." *Id.* at 227, 93 S.Ct. at 2048. A review of all the circumstances in this case leads this Court to conclude that the consent to search that was given by defendants Smithen and Hoffman was voluntary. Defendants make much of the fact that the officers did not give any *Miranda*-type warnings to the defendants regarding their Fourth Amendment rights. The Supreme Court in *Schneckloth* rejected this very argument noting "it would be thoroughly impractical to impose on the normal consent search the detailed requirements of an effective warning." *Id.* at 231–32, 93 S.Ct. at 2050. This Circuit has not adopted any

exceptions to this general rule. *See Smith,* at 1118; *see also* 3 W. LaFave, Search & Seizure, § 8.2(i), at 190–91 (2d ed. 1987) ("a valid consent may be established without a showing that the police advised the consenting party of his Fourth Amendment rights or that this party was otherwise aware of those rights").

Accordingly, the joint motion of co-defendants Smithen and Hoffman to suppress the evidence seized from them while on board the train is DENIED.