**UNITED STATES of America, Plaintiff–Appellant,**

v.

**Harold Evan GRANT, Defendant–Appellee.**

Nos. 90–1397, 90–1398.

United States Court of Appeals, Sixth Circuit.

Argued July 27, 1990.

Decided Dec. 3, 1990.

Rehearing Denied in No. 90–1397 Feb. 13, 1991.

Robert Cares, Detroit, Mich., for plaintiff-appellant.

Kenneth R. Sasse, Detroit, Mich., for defendant-appellee.

Before KEITH and GUY, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

KEITH, Circuit Judge.

Defendant Harold Evan Grant ("Grant") is charged with possession with intent to distribute over one kilogram of phencyclidine ("PCP"), in violation of 21 U.S.C. § 841(a)(1). The United States (the "Government") appeals from the district court's March 21, 1990 order suppressing evidence,[1] pursuant to 18 U.S.C. § 3731; and its March 8, 1990 order releasing Grant on bail, pursuant to 18 U.S.C. § 3145. For the reasons stated below, we AFFIRM.

---

**1.** On March 8, 1990, the district ruled from the bench and granted defendant Harold Evan Grant's motion to suppress evidence. The district court's March 8, 1990 bench ruling was superceded and revised by its March 21, 1990 memorandum and order, which is the subject of this appeal.

## I.

## A.

Based on the January 18, 1990 suppression hearing testimony of Border Patrol Agent Donald Buechner ("Agent Buechner"); Border Patrol Agent Jeffery Coudure ("Agent Coudure") (collectively "the agents"); Roger LaGrone, a supervisor for Northwest Airlines at LaGuardia Airport in New York City ("LaGrone"); Albert Sornberger, an officer with the New York Port Authority stationed at LaGuardia Airport ("Officer Sornberger"); and Larry Cornish, a Deputy Wayne County Sheriff ("Deputy Cornish"), the district court made the following findings of fact:

Border Patrol agents regularly check early morning flights arriving at Detroit Metropolitan Airport from the Southwest for drug traffickers and for illegal aliens, because those flights are not checked in their cities of origin. The agents check both passengers who deplane and those in transit. According to their testimony, the agents regularly question everyone who remains seated on such a flight, regardless of whether or not there is an articulable reasonable suspicion that the person is an illegal alien.

On November 19, at approximately 6:00 AM, there were two Border patrol agents [Agent Buechner and Agent Coudure] present at the Detroit Metropolitan Airport to check Northwest Airlines flight 338, a domestic flight that originated in Los Angeles and was scheduled to proceed on from Detroit to New York City. Flight 338 arrived at approximately 6 AM and was scheduled to depart at approximately 7 AM. The arriving passengers deplaned before the Border Patrol agents reached the gate.

When the agents arrived at the gate at approximately 6:30 AM, they boarded the plane and walked through it once without questioning anyone. They then left the plane to question two passengers suspected of being illegal aliens who had already deplaned and were waiting in the gate area. After determining that the two passengers were illegal aliens, the agents re-boarded the aircraft to begin the process of questioning all persons who they thought might be aliens. The questioning process went as follows: the agents identified themselves as Border Patrol agents; they asked the passengers where they came from and their destination; and then they asked each passenger to produce immigration documents. The agents described themselves as dressed in Levi's jeans. They gave no reason why they were not in uniform despite the fact that they were conducting an activity traditionally conducted by uniformed Border Patrol agents.

At the beginning of their sweep through the plane, the agents observed Grant asleep at the back of the plane. They decided to begin the sweep by questioning Grant because of his [dreadlocks] hairstyle,[2] which indicated that he might be of Jamaican origin. According to Buechner, they approached him first "just to be on the safe side." One of the agents tapped Grant on the shoulder and identified himself as a Border patrol agent. He asked Grant where he was coming from. He responded, "Los Angeles." The agent asked where Grant was born. He responded, "Belize." The agent asked Grant how long he had been in the United States. He responded, "Six years." The agent asked Grant for his immigration documents, or "green card." He responded that it was in his carry-on bag. He then retrieved his carry-on bag and produced the card. The agent saw nothing suspicious in the card other than that it might be a forgery, because the agent said he occasionally encountered forged green cards. Nothing on the face of the document presented to the agent suggested that it was a forgery.

The agent observed that Grant was shaking as he handed the green card over to

**2.** The dreadlocks hairstyle features long hair that has been matted or braided into clumps. *See Webster's II New Riverside University Dictionary* 404 (1984). Dreadlocks are often worn by Rastafarians, members of a black Jamaican religious group who worship Haile Selassie. *See id.* at 975.

him. While the agent was questioning Grant, he stood in the aisle of the aircraft next to him. Another agent stood one row away. A third law enforcement officer, Wayne County Deputy Sheriff Cornish, was positioned at the nose of the aircraft.

The agent looked for Grant's name on a passenger manifest for flight 338, obtained from Northwest Airlines, and could not find it. The agents sometimes make use of passenger manifests, if they are available. However, there is nothing in the record to suggest that the manifests accurately reflect the names of all the passengers on the aircraft. The agent then asked Grant where he was going. Grant said that he was going to John F. Kennedy Airport in New York, while the aircraft was actually headed to LaGuardia.

The agent then asked Grant for his ticket. He said that the ticket was in his checked luggage. This made the agent suspicious. However, the [district court] takes judicial notice of the fact that a ticket is not necessary to board a Northwest Airlines flight. At check-in, the airline agent removes the ticket from the passenger's ticket package, leaving the passenger with a copy. The airline agent places the original ticket in the passenger's boarding pass. The original is removed from the boarding pass when the passenger boards the plane.

After learning that Grant did not have his ticket, the agent asked Grant to look for it in his carry-on bag. Grant looked in the bag briefly and then stood up and walked forward to a location in the middle of the aircraft on the left side, taking his carry-on bag with him. The agent followed Grant and told him that he still needed to see his ticket. Grant said he would look for it. The agent left to question other passengers.

Working from the front of the aircraft, while the other agent worked from the rear, the two Border Patrol agents proceeded to remove 56 passengers from the flight. They then returned to Grant who again appeared to be asleep. They woke him again. At the inception of this sec-

ond round of questioning, the agents asked Grant to leave the aircraft. He agreed to do so.

At this point, the aircraft was five to ten minutes away from its scheduled departure from Detroit. As the agent deplaned with Grant, he told the flight attendant that one passenger might or might not return to the aircraft. However, he did not ask that the aircraft be held until a determination was made. Nor did he tell Grant that he had a choice as to whether or not he wanted to deplane.

Grant was taken to an area where all of the other aliens who had been taken off the plane and arrested were sitting. He was placed in a row by himself. The agent then asked if they could go through his carry-on bag. He consented. In the course of that search, the agents discovered a small quantity of marijuana. Grant was then arrested for a state law offense, but he remained in the custody of the Border Patrol. The agent then conducted a full body search incident to the arrest.

During that search, the agent discovered a baggage claim ticket. Grant denied that it was his. The agent then contacted Northwest Airlines at LaGuardia and asked them to retrieve the bag. Grant was taken to the Detroit lock-up of the Border Patrol. At that time, Grant admitted that the luggage check belonged to him and said that he initially denied ownership because he was nervous and sleepy. Grant's acknowledgement of ownership occurred between 7:30 and 7:45 AM. The aircraft did not arrive in New York until 8:30 AM.

At LaGuardia, a Northwest supervisor immediately set out to retrieve the luggage. The bag was retrieved and found to be locked. It was placed in an x-ray machine by Northwest service manager LaGrone, who determined that it contained two gasoline-type metal cans. He refused to return the bag without ascertaining the contents of the cans. He contacted the New York Port Authority police who took the bag to United States

Customs. Port Authority Police Officer Sornberger had contacted an assistant United States Attorney in Detroit who told him that he needed a search warrant to open the bag. She suggested having the bag sniffed by a drug-detection canine. When the dog did not alert to the presence of drugs, [Officer] Sornberger had no choice but to return the bag to Northwest. [Officer] Sornberger testified that, at that time, he had no reason to believe that the bag contained contraband.

[Officer] Sornberger and a customs agent returned the bag to Northwest, where LaGrone still refused to return it to Detroit until he had determined what was inside it. The bag was then opened by the officers in the presence of LaGrone. LaGrone testified that the bag was opened at his directive. [Officer] Sornberger confirmed this version of the events; however, he noted that neither he nor the customs agent had mentioned the discussion he had with the Assistant United States Attorney in Detroit about needing a search warrant before the bag could be opened.

When the cans were removed from the bag, they smelled of lacquer-thinner. Northwest personnel put them in a storage area controlled by Northwest and then returned the bag to Detroit without the cans. LaGrone testified further that if Grant had shown up with the baggage claim ticket, the cans would have been returned to him. Sometime later, other Port Authority officers returned and smelled the cans again and determined that they contained ether. The cans were then seized for testing because PCP can be contained in an ether base. The Drug Enforcement Agency ["DEA"] was called to test the substance in the cans. Laboratory testing revealed that the cans contained PCP.

*United States v. Grant,* 734 F.Supp. 797, 799–801 (E.D.Mich.1990) (footnote added).

### B.

Grant was arrested on November 19, 1989, and detained by a magistrate's November 21, 1989 order. On November 29, 1989, Grant was charged in a one-count indictment for possession with intent to distribute one kilogram of PCP, in violation of 21 U.S.C. § 841(a)(1).

On December 21, 1989, Grant filed a motion to suppress the evidence obtained at the time of his arrest. Grant argued that his fourth amendment rights were violated by the agents' search and seizure of his person at the Detroit Metropolitan Airport and the subsequent warrantless search of his luggage in New York. The district court referred the motion to suppress to a magistrate, who held a suppression hearing on January 18, 1990. On January 22, 1990, after hearing testimony from the Government's witnesses, the magistrate ruled that even though Grant was scheduled to travel from Los Angeles to New York, Grant voluntarily left the airplane in Detroit and voluntarily consented to a search of his carry-on bag after leaving the airplane. The magistrate concluded, however, that Grant's fourth amendment rights were violated by the warrantless search of his luggage in New York. Thus, the magistrate recommended that the motion to suppress be granted.

On February 14, 1990, after hearing cross-objections to the magistrate's report and recommendation, the district court granted the motion to suppress in a ruling from the bench. Grant then moved the district court for review of the magistrate's November 21, 1989 detention order. Grant's motion was held in abeyance after the Government moved, on February 16, 1990, for reconsideration of the motion to suppress.

Ruling from the bench on March 8, 1990, the district court denied the Government's motion for reconsideration, and ordered the evidence suppressed, pursuant to 18 U.S.C. § 3731. The court also set conditions for the release of Grant on bond, pursuant to 18 U.S.C. § 3145, but delayed Grant's release to allow the Government an opportunity to review the suppression order.

On March 21, 1990, the district court entered a memorandum and order superceding and revising its March 8, 1990

bench ruling. After reviewing the facts and relevant precedents, the district court held that the agents' actions constituted an illegal seizure of Grant's person:

[T]he Court finds that, like a passenger seated in the cramped interior of a Greyhound bus, Grant, seated in the cramped rear quarters of an aircraft, confronted by a police officer who boarded the vehicle and began to ask questions and review identification papers, would not feel free to walk away. Indeed, the Court finds that Grant did walk away. Yet the Border Patrol agent, without reasonable suspicion, persisted in his inquiry under circumstances where a reasonable person in Grant's position would not have felt that he had any place to go—because he was travelling on to New York—and would have been forced to sit in his seat and answer the agents questions. Under those circumstances, the Court finds that Grant left the aircraft involuntarily and under police coercion. As a consequence, any subsequent conversation or seizure of evidence from Grant was involuntary and violated his Fourth Amendment rights.

*Grant,* 734 F.Supp. at 802 (footnote omitted).

The district court next held that the search of Grant's luggage in New York City was illegal:

The search of Grant's bag in New York City also violated his Fourth Amendment rights. At the time of the search, the agents in Detroit directing the search were fully aware that the luggage belonged to Grant and that he claimed ownership interest in it. It is simply fatuous to suggest, as the [G]overnment does, that the opening of the bag by the officers in New York City was at the direction of the supervisor of Northwest Airlines. The officers in New York City had been told that before they could open the bag, it was necessary for them to obtain a search warrant. The [G]overnment cannot shift the blame for opening the bag to the Northwest supervisor under the circumstances.... Consequently, anything obtained in the search of the bag must be suppressed.

*Grant,* 734 F.Supp. at 802–03 (footnote omitted).

On April 4, 1990, the district court again stayed Grant's release until April 11, 1990; thus, allowing the Government an opportunity to seek review in this court. *See Grant,* 734 F.Supp. at 803. On April 10, 1990, this court denied the Government's motion to stay Grant's release pending appellate review. *United States v. Grant,* No. 90–1397/1398 (6th Cir. Apr. 10, 1990) (order denying motion to stay defendant's release).

On April 2, 1990, the Government filed a timely appeal with this court, seeking appellate review of the district court's March 21, 1990 order suppressing evidence, and its March 8, 1990 order releasing Grant on bail.

The issues on appeal are: (1) whether the district court erred in finding that Grant was impermissibly seized by the agents in Detroit; (2) whether the district court erred in finding that Grant's luggage was impermissibly searched in New York; and (3) whether the district court erred in releasing Grant on bail.

## II.

The fourth amendment protects "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures...." U.S. Const. amend. IV. Whether the seizure involves a traditional arrest, a brief detention, or a stop and frisk, the fourth amendment requires law enforcement officers to base their actions on objective justifications. *See Reid v. Georgia,* 448 U.S. 438, 440, 100 S.Ct. 2752, 2753, 65 L.Ed.2d 890 (1980); *Terry v. Ohio,* 392 U.S. 1, 16–19, 88 S.Ct. 1868, 1877–78, 20 L.Ed.2d 889 (1968).

The finding that a citizen has been subjected to a fourth amendment search or seizure involves a question of fact and cannot be reversed unless clearly erroneous. *See United States v. Rose,* 889 F.2d 1490, 1494 (6th Cir.1989). *See also United States v. Gray,* 883 F.2d 320, 322 (4th Cir.1989). To determine the constitutionali-

ty of a search or seizure, we will judge each case upon its own facts. *United States v. Mendenhall*, 446 U.S. 544, 565 n. 6, 100 S.Ct. 1870, 1877 n. 6, 64 L.Ed.2d 497 (1980) (Powell, J., concurring); *United States v. Clardy*, 819 F.2d 670, 672 (6th Cir.1987). In each airport encounter between a police officer and a citizen, "there will be endless variations in the facts and circumstances, so much variation that it is unlikely that the courts can reduce to a sentence or a paragraph a rule that will provide unarguable answers to the question whether there has been an unreasonable search or seizure in violation of the Fourth Amendment." *Florida v. Royer*, 460 U.S. 491, 506–07, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983) (White, J., plurality opinion).

### A.

To determine whether the agents seized Grant in violation of the fourth amendment, we must initially decide whether Grant was seized. This court's traditional test asks: in light of all of the circumstances, would "a reasonable person ... have believed that he or she was not free to walk away." *See United States v. Saperstein*, 723 F.2d 1221, 1225 (6th Cir.1983); *Clardy*, 819 F.2d at 672.

In considering whether a police-citizen airport encounter constitutes a seizure or a consensual encounter, the federal courts have often focused on three factors: (1) the conduct of the police, *United States v. Garcia*, 866 F.2d 147, 150 (6th Cir.1989); *United States v. Knox*, 839 F.2d 285, 289–90 (6th Cir.1988), *cert. denied*, 490 U.S. 1019, 109 S.Ct. 1742, 104 L.Ed.2d 179 (1989); (2) the characteristics of a particular defendant, *United States v. Patino*, 649 F.2d 724, 727 (9th Cir.1981); *United States v. Andrews*, 600 F.2d 563, 566 (6th Cir. 1979); and (3) the physical surroundings of the encounter, *Clardy*, 819 F.2d at 672; *United States v. Jefferson*, 650 F.2d 854, 858 (6th Cir.1981). *See generally United States v. Gray*, 883 F.2d 320, 323 (4th Cir.1989) (positing three-part test).

In the case at bar, the conduct of the agents and Deputy Cornish evidences

the district court's conclusion that Grant was seized in Detroit. A fourth amendment seizure occurred because the agents exercised their authority in a manner which made it apparent to Grant that he was "not free to ignore the officer[s] and proceed on his way." *United States v. Black*, 675 F.2d 129, 135 (7th Cir.1982), *cert. denied*, 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983). Grant did not "freely and voluntarily" consent to being interrogated by the agents aboard the airplane; nor did he "freely and voluntarily" consent to leave the plane with the agents. *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968). *See also Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973).

A consideration of the totality of the circumstances demonstrates that Grant was a victim of police coercion. The agents began their sweep of the airplane by tapping Grant on the shoulder; waking him from his sleep; and initiating an interrogation. This "physical touching of the person of the citizen," while not controlling, supports a finding that Grant was seized. *See Mendenhall*, 446 U.S. at 550, 100 S.Ct. at 1875. Because the agents twice awakened Grant from his sleep; demanded that he produce his green card; and continued the interrogation even after Grant produced the immigration document, the agent's threatening, intrusive and coercive behavior indicates that a seizure occurred. *See id.; Clardy*, 819 F.2d at 672; *Jefferson*, 650 F.2d at 856. The Government argues that the agents were not threatening because they were dressed in plainclothes and did not display their weapons. A reasonable person, however, "would not believe that a police officer is not armed." *United States v. Fields*, 733 F.Supp. 4, 7 (D.D.C. 1990) (finding impermissible seizure of bus passenger by police officers wearing plainclothes). In addition, the removal of 55 alleged illegal aliens from the airplane by three law enforcement officers—the two agents and Deputy Cornish in uniform—supports a finding that there was a sufficient show of authority to persuade Grant

that he was not free to ignore the agents' requests. *See Clardy,* 819 F.2d at 672; *United States v. Lucci,* 758 F.2d 153, 155 (6th Cir.1985); *Jefferson,* 650 F.2d at 856; *Fields,* 733 F.Supp. at 7.

▮ Our consideration of the second factor—Grant's unique characteristics—persuades us that he did not have a consensual encounter with the agents. In *United States v. Patino,* 649 F.2d 724 (9th Cir. 1981), the Ninth Circuit affirmed the district court's finding that the defendant had been seized when the police requested an interview. *See id.* at 728–29. The *Patino* court explained that the defendant had problems understanding English and that "she was an alien who may have felt a greater compulsion to abide by the request of the police." *Id.* at 727. Similarly, Grant was born and raised in Belize, a Spanish-speaking, Central American nation. Due to his ignorance of police practices in the United States and his status as an alien, Grant most likely felt compelled to answer the agents' questions and to submit to their demands. *See id.* Considering the coercive tactics employed by the agents both aboard the plane and in the airport, we conclude that Grant reasonably did not believe himself free to walk away.

Applying the third factor, courts have looked to the physical setting of a particular police-citizen encounter to determine whether the encounter constituted a seizure. In *United States v. Felder,* 732 F.Supp. 204 (D.D.C.1990), the district court found that the police practice of randomly approaching Greyhound bus passengers, without articulable suspicion, for purposes of questioning and conducting searches violated the fourth amendment. *Id.* at 208. The *Felder* court concluded that because the police officers effectively confined defendant to his seat for interrogation and defendant could not leave the bus, the officers seized defendant in violation of the fourth amendment. Thus, defendant's subsequent consent to the officers' search of his bag did not overcome the taint of the impermissible seizure. *See id.* at 208–09. Moreover, in *United States v. Fields,* 733 F.Supp. 4 (D.D.C.1990), the district court

found that police officers had impermissibly seized a bus passenger when they blocked him from standing up and leaving the bus prior to asking for consent to search his bag:

[O]nce approached by the officers, there was no place for the defendant to go but to remain on the bus. The circumstances are much different from the 'encounter' which takes place within a bus station, *see United States v. Winston,* 892 F.2d 112 (D.C.Cir.1989) ... where the citizen can walk away. The defendant here had no place to go except to step off the bus, assuming he felt free to do so, thereby running the risk that the bus might leave without him. Moreover the situation is different than an 'encounter' on a train where a citizen has the option of walking into another car without actually leaving the train. See *United States v. Savage,* 889 F.2d 1113 (D.C.Cir.1989); *United States v. Baskin,* 886 F.2d 383 (D.C.Cir. 1989); *United States v. Brady,* 842 F.2d 1313 (D.C.Cir.1988).

*Fields,* 733 F.Supp. at 7. The *Fields* court concluded that this "bus-stop" rose to the level of a seizure in violation of the fourth amendment because, under the circumstances, a reasonable man would not have felt free to ignore the officers or refuse consent to their search of his bag. *See id.* at 7. *See also United States v. Cothran,* 729 F.Supp 153 (D.D.C.1990) (finding that an impermissible seizure occurred when police officer, acting without particularized suspicion, entered bus to interrogate and search bus passengers); *United States v. Lewis,* 728 F.Supp. 784 (D.D.C.1990) (same).

▮ Like the bus passengers in *Felder* and *Fields,* Grant could not walk away from the agents when they began to interrogate him on the plane. Even if Grant felt that he remained free to leave the plane, he could not distance himself from the agents without risking that the plane would take off before he could reboard. This court has declined to find an impermissible seizure in several cases where police officers approached citizens in the public areas of an airport. *See, e.g., Garcia,* 866

F.2d at 151; *United States v. Collis*, 766 F.2d 219 (6th Cir.), *cert. denied*, 474 U.S. 851, 106 S.Ct. 150, 88 L.Ed.2d 124 (1985); *United States v. Moore*, 675 F.2d 802, 807–08 (6th Cir.1982). Grant's situation, however, was decidedly different. Citizens approached in an airport concourse retain the freedom to walk away from the officers; Grant was approached by the agents after boarding and had no place to go but to remain on the plane.[3]

After his initial interrogation by the agents, Grant exercised his one option—changing seats—but the agents persisted by awakening Grant in his new seat and initiating a second interrogation. Under the totality of the circumstances, a reasonable person would not have felt "free to walk away" and, thus, at this point, Grant was seized. *See Saperstein*, 723 F.2d at 1225. *See also Clardy*, 819 F.2d at 672. Although the Government contends that Grant voluntarily consented to questioning by the agents, we reject the Government's contention on the grounds that by changing seats aboard the airplane, Grant clearly expressed his desire to terminate the agents' interrogation. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973) ("[Voluntariness] is a question of fact to be determined from the totality of all the circumstances.").

We must also reject the Government's argument that Grant voluntarily consented to leave the plane with the agents. A reasonable person, ticketed and scheduled to fly from Detroit to New York, would not voluntarily deplane in Detroit moments before take-off. Grant did not have a "casual contact" with the agents; a seizure also occurred when the agents required Grant to deplane and to accompany them to the Detroit airport concourse—"a place to which [Grant] had not planned to go." *Garcia*, 866 F.2d at 151 ("[T]he one occurrence which seems to distinguish 'seizures' from casual contacts between police and citizens is when the defendant is asked to accompany the police or agents to a place to which the defendant had not planned to go.").

**B.**

■ Having established that Grant was seized, our next inquiry is whether the seizure was constitutionally permissible. It has long been held that a police officer may briefly detain a citizen for questioning even if the officer does not have probable cause to believe that the citizen is involved in criminal activity. *See, e.g., Terry*, 392 U.S. at 30, 88 S.Ct. at 1884. The officer must, however, "have a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity." *Brown v. Texas*, 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979). *See U.S. v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581 at 1585, 104 L.Ed.2d 1 (1989); *Terry*, 392 U.S. at 30, 88 S.Ct. at 1884.

A police officer's hunch or generalized suspicion of criminal activity will not be

---

**3.** The Government argues that this case is governed by *Immigration and Naturalization Service v. Delgado*, 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984). We disagree. In *Delgado*, the Supreme Court held that INS raids, in which armed agents blocked all factory exits, did not constitute fourth amendment seizures of the entire workforces. *Id.* at 218–19, 104 S.Ct. at 1763–64. The Court explained that the plaintiffs had not been seized because they had consensual encounters with INS agents and the workforces had not been seized because the workers were generally free to move about the factory. *See id.* at 218, 221, 104 S.Ct. at 1763, 1765. Grant's encounter with the agents on the plane is not comparable to the workers encounters with INS agents in the factories. The workers were approached during the day in the presence of their co-workers. Grant, traveling alone, was twice awakened in the middle of the night; twice interrogated; and required to produce his immigration documents. Thus, Grant's "encounter" with the agents was far more threatening, intrusice and coercive. In addition, the *Delgado* workers retained the freedom to move around the factory. Grant's movements, however, were at the agents' request, as he had no place else to go without leaving the plane. When Grant relocated to a new seat on the plane to terminate the agents' first interrogation, the agents followed him to his new seat and initiated a second round of interrogation. In *Delgado*, the workers were not required to leave the factory. *See id.* at 221, 104 S.Ct. at 1765. In the present case, however, the agents required Grant to deplane moments before take-off, thus seizing Grant in violation of the fourth amendment.

sufficient to justify the detention of a citizen. *See Terry*, 392 U.S. at 27, 88 S.Ct. at 1884. As the Supreme Court recognized in *United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989):

> The Fourth Amendment requires "some minimal level of objective justification" for making the stop. *INS v. Delgado*, 466 U.S. 210, 217 [104 S.Ct. 1758, 80 L.Ed.2d 247] (1984). That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. We have held that probable cause means "a fair probability that contraband or evidence of a crime will be found," *Illinois v. Gates*, 462 U.S. 213, 238 [103 S.Ct. 2317, 2332, 76 L.Ed.2d 527] (1983), and the level of suspicion required for a Terry stop is obviously less demanding than that for probable cause. *See United States v. Montoya de Hernandez*, 473 U.S. 531, 541 [105 S.Ct. 3304, 3310, 87 L.Ed.2d 381] (1985).

*Sokolow*, 109 S.Ct. at 1585.

In *Sokolow*, the Court held that DEA agents had reasonable suspicion to make an investigative stop of a suspected drug courier at the Honolulu International Airport. *See id.* at 1587. The Government argued that the agents had reasonable suspicion to stop the suspect because: (1) he paid $2,100 for two airplane tickets from a roll of $20 bills; (2) he traveled under a name which did not match the name under which his telephone number was listed; (3) he stayed in Miami only 48 hours, even though a round-trip flight from Honolulu to Miami takes 20 hours; (4) his original destination was Miami, a source city for illicit drugs; (5) he appeared nervous during the trip; and (6) he checked none of his luggage. *See id.* at 1583. The Court found that the first three factors had "probative significance":

> Paying $2,100 in cash for two airplane tickets is out of the ordinary, and it is even more out of the ordinary to pay that sum from a roll of $20 bills containing nearly twice that amount of cash.... We also think the agents had a reasonable ground to believe that respondent was traveling under an alias; the evidence was by no means conclusive, but it

was sufficient to warrant consideration. While a trip from Honolulu to Miami, standing alone, is not a cause for any sort of suspicion, here there was more: surely few residents of Honolulu travel from that city for 20 hours to spend 48 hours in Miami during the month of July. *Id.* at 1586. Considering "the totality of the circumstances—the whole picture," the Court found that these factors, taken together, amounted to reasonable suspicion which justified the agents' detention of the suspect. *See id.* at 1585 (quoting *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981)).

In the case at bar, the Government relies on *Sokolow* to argue that the agents had reasonable suspicion to detain Grant both by following him to a new seat and by requiring him to deplane prior to take-off. Because *Sokolow's* facts are inapposite to those of the present case, we do not find the Government's argument to be persuasive.

Initially, the Government ignores the lesson of *Sokolow* that a finding of reasonable suspicion must rest not on isolated facts, but upon the totality of the circumstances. *See id.* At the time the agents approached Grant, their suspicion that he was engaged in criminal activity was largely based on their brief observation of him after they had boarded the plane. The agents had no advance evidence that Grant was an illegal alien nor a drug courier. Unlike the suspect in *Sokolow*, there was no evidence that Grant had purchased his plane ticket with small bills laundered from drug sales; there was no evidence that Grant was making a brief "drop-off" trip to New York as Grant had purchased a one-way ticket; and there was no evidence that Grant was traveling under an alias as he readily produced his green card. *See id.* 1586. The agents observed Grant engaging in a prevalent nighttime activity—sleeping—and observing this conduct does not usually lead experienced police officers to believe that criminal activity is afoot. *Compare Terry*, 392 U.S. at 28–29, 88 S.Ct. at 1883–84. After the agents awakened Grant and began questioning him, Grant's

responses were not indicative of criminal activity. Grant gave direct answers to the agents' questions as to his immigration from Belize, his immigration status, and the origin of the flight. These aspects of Grant's conduct were clearly insufficient to provide reasonable suspicion that he was engaged in criminal activity.

The Government argues that the agents had reasonable suspicion to detain Grant because they knew that he had embarked from Los Angeles, a source city for drug couriers, and that he had boarded a flight which left at a time when police officers were not checking boarding passengers. Initially, there is nothing in the record to show that Grant nor any member of the general public knew that the police would not monitor the boarding of the flight in Los Angeles. In addition, this Court has previously held that "travel from Los Angeles cannot be regarded as in any way suspicious." *United States v. Andrews*, 600 F.2d 563, 566–67 (6th Cir.1979) ("[O]ur experience with DEA agent testimony in other cases makes us wonder whether there exists any city in the country which a DEA agent will not characterize as either a major narcotics distribution center or a city through which drug couriers pass on their way to a major narcotics distribution center."). *See also Sokolow*, 109 S.Ct. at 1586 (suggesting that a trip from Honolulu to Miami, "a drug source city, is not a cause for any sort of suspicion"). Moreover, in *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980), the Supreme Court invalidated the very criteria at issue here. The Court held that (1) the suspect's arrival at the Atlanta airport from a "drug source" city was inadequate to support a finding of reasonable suspicion; and (2) the suspect's arrival in the early morning, when law enforcement activity is diminished, also would not justify a finding of reasonable suspicion. *See id.* at 440–41, 100 S.Ct. at 2753–54. The Court concluded that these facts "describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case

could justify a seizure." *Id.* at 441, 100 S.Ct. at 2754.

The Government next contends that the agents reasonably suspected Grant because he displayed nervousness; had shaking hands; and misstated the destination of his flight as New York's John F. Kennedy Airport, when it was actually going to La-Guardia Airport. We are unpersuaded by the Government's contentions, as Grant's alleged nervousness and inability to correctly identify the flight destination may have simply been due to the fact that the agents awoke and interrogated him in the middle of the night. Moreover, "[n]ervousness is entirely consistent with innocent behavior, especially at an airport where a traveller may be anticipating a long-awaited rendezvous with friends or family." *Andrews*, 600 F.2d at 566. *See also Saperstein*, 723 F.2d at 1228 (deeming certain behavior characteristics, such as nervousness, to be inherently unsuspicious).

The Government also argues that the agents had reasonable suspicion to detain Grant because he did not produce his plane ticket at their request. The Government's argument, however, cannot survive the analysis of *Reid:* do the facts justifying the seizure apply to "a very large category of innocent travelers" and potentially subject them to "virtually random seizures?" *Reid*, 448 U.S. at 441, 100 S.Ct. at 2754. When the agent asked Grant for his ticket, Grant offered the plausible explanation that he had placed it in his checked luggage. As the district court noted, airplane travelers often receive a boarding pass which is required for admission to the plane and a copy of the original ticket which is not so required. *Grant*, 734 F.Supp. at 800. The district court also found that because Grant had purchased a one-way ticket, he had no pressing need to carry the ticket copy with him nor even to retain the ticket copy at all. *See id.* Contrary to the Government's view, the agents could not have determined whether Grant had retained his boarding pass for admission to the plane and placed the ticket copy in his luggage before checking it at the airline reservation counter. Moreover, Grant may have placed his ticket copy in a

carry-on bag, but was then asked by airline personnel at the gate to check the carry-on bag immediately prior to boarding. Since airline personnel often reject carry-on bags at the gate due to space limitations, Grant's explanation was not unreasonable. *Cf. Illinois v. Gates*, 462 U.S. 213, 243–44 n. 13, 103 S.Ct. 2317, 2335 n. 13, 76 L.Ed.2d 527 (1983) ("In making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts.").

Equally unpersuasive is the Government's argument that the detention was justified by the fact that Grant's name did not appear on the flight manifest. The district court found that there was no evidence in the record that the flight manifests accurately reflect the names of all passengers on an aircraft. *Grant*, 734 F.Supp. at 800. For example, it is not uncommon for parents to purchase airplane tickets in their own name for their childrens' use when traveling to and from college. Moreover, in many large corporations, professional firms and governmental agencies, employees make business trips using airline tickets bearing the names of their supervisors, subordinates and/or coworkers due to minor emergencies, such as employee illness, which may require last-minute personnel changes on a given business trip. *Cf. Sokolow*, 109 S.Ct. at 1586 (analyzing validity of investigative stop by comparing business travelers who often purchase airline tickets with plastic money to drug couriers who often purchase airline tickets with cash). Additionally, the case at bar can easily be distinguished from those cases where there were objective indications that the suspect was traveling under an alias. *See, e.g., Mendenhall*, 446 U.S. at 548, 100 S.Ct. at 1873 (declining to find an unlawful seizure where suspect produced a driver's license with a name different from the name on her airline ticket). The agents questioning Grant, however, did not have objective evidence that Grant was in any way dishonest. The agents, having failed to acquire the requisite information from the flight manifest or

the ticket that was unnecessary for Grant to retain, merely made an inferential leap to the conclusion that Grant was traveling under an alias and involved in criminal activity. Because the agents' conclusion was not based on articulable facts, we cannot find reasonable suspicion.

The Government also argues that the agents were justified in detaining Grant because he was originally from Belize; and his appearance differed from the photograph on the immigration card. However, the significance of Grant's national origin evaporated as soon as he produced his green card. Moreover, there was no indication on the card that the immigration information Grant had orally provided to the agents was inaccurate. The district court also found that "[n]othing on the face of the document presented to the agent suggested that it was a forgery." *Grant*, 734 F.Supp. at 800. In addition, the Government's argument is rebutted by the fact that there are many "innocent travelers" upon our nation's airlines who were born in foreign countries, but nonetheless, have established legal residency or citizenship in the United States. *See Reid*, 448 U.S. at 441, 100 S.Ct. at 2754.

Although the Government has argued that Grant was detained because he was from Belize and his immigration documents were questionable, the district court found that the agents had originally decided to question Grant because they observed that he wore a dreadlocks hairstyle and suspected that he might be Jamaican. *Grant*, 734 F.Supp. at 799. These initial criteria were clearly inappropriate to justify a stop. *See United States v. Taylor*, 917 F.2d 1402 (6th Cir.1990) (holding that police officers' observations of Taylor, a black suspect, walking nervously and quickly through the airport were racially-biased and insufficient to justify a search and seizure); *Ramirez v. Webb*, 599 F.Supp. 1278, 1284 (W.D.Mich. 1984) ("[H]ispanic appearance ... is not a valid reason to stop anyone."), *aff'd*, 787 F.2d 592 (6th Cir.1986). *Cf. United States v. Brignoni–Ponce*, 422 U.S. 873, 886–87, 95 S.Ct. 2574, 2582–83, 45 L.Ed.2d 607 (1975) ("Large numbers of native-born and

naturalized citizens have the physical characteristics identified with Mexican ancestry, [but] even in the border area a relatively small proportion of them are aliens.").

Prior to initially questioning Grant, the agents only had two indicia of suspicion: (1) their own racially-biased assumption that because Grant was a man of color wearing dreadlocks, he must have been an illegal alien from Jamaica; and (2) their long-discredited drug source city rationale that because Grant had embarked from Los Angeles, he must have been a drug courier. *See Andrews*, 600 F.2d at 566–67 (rejecting the "drug source city" rationale). *See also United States v. Buenaventura–Ariza*, 615 F.2d 29, 31 (2d Cir.1979); *United States v. McCaleb*, 552 F.2d 717, 720 (6th Cir.1977); *United States v. Scott*, 545 F.2d 38, 40 n. 2 (8th Cir.1976), *cert. denied*, 429 U.S. 1066, 97 S.Ct. 796, 50 L.Ed.2d 784 (1977). On these facts, we can hardly find that the agents acted upon particularized suspicion. Moreover, we cannot conclude that Grant's race, ethnic identity or Los Angeles flight-origin furnished reasonable grounds for the agents to believe that he was an illegal alien or a drug courier. If the agents' approach in this case became prevalent among law enforcement officers across the nation, many black or Hispanic men boarding transcontinental flights out of drug source cities, such as Los Angeles, "would be subject to virtually random seizures," regardless of innocence or guilt. *See Reid*, 448 U.S. at 441, 100 S.Ct. at 2754. *See also Aptheker v. Secretary of State*, 378 U.S. 500, 519–20, 84 S.Ct. 1659, 1670–71, 12 L.Ed.2d 992 (1964) (Douglas, J. concurring) ("[F]reedom of movement is the very essence of our free society, setting us apart. Like the right of assembly and the right of association, it makes all other rights meaningful....").

The totality of the circumstances in the present case, therefore, did not yield "particularized suspicion" to justify the agents' seizure of Grant "based on a reasonable and articulable suspicion of criminal activity." *Clardy*, 819 F.2d at 673.

### C.

■ Because Grant was improperly seized by the agents, his subsequent consent to the search of his carry-on bag did not overcome the taint of the agents' prior conduct. *See Clardy*, 819 F.2d at 673; *United States v. Maragh*, 894 F.2d 415, 419–20 (D.C.Cir.1990). The "primary taint of the unlawful invasion" may only be purged when the suspect's subsequent consent is "the product of an intervening act of free will." *Wong Sun v. United States*, 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963). Since such an intervening event was not present in this case, Grant's consent to the search of his bag did not remove the prior taint of his unconstitutional seizure by the agents.

Although the Government argues that Grant willingly consented to the search, we conclude, based on the totality of the circumstances, that Grant's consent was not voluntary. *See Schneckloth*, 412 U.S. at 227, 93 S.Ct. at 2047. Prior to the search, Grant had been twice awakened by the agents in the middle of the night; required to produce his plane ticket and immigration documents; twice interrogated even though he changed plane seats to terminate the first interrogation; and subsequently required to deplane in Detroit from his New York bound flight. We are convinced that under these circumstances, a reasonable man, innocent of any crime, would not have felt capable saying "no" to the agents' demand to search the bag. *See Clardy*, 819 F.2d at 673; *Maragh*, 894 F.2d at 419–20; *Fields*, 733 F.Supp. at 7; *Felder*, 732 F.Supp. at 208.

### D.

The Government contends that because Officer Sornberger opened Grant's luggage in New York under the direction of LaGrone, a Northwest Airlines supervisor, the search of Grant's luggage was a private search not governed by the fourth amendment. Grant responds that the search of his luggage in New York was directed and conducted by Government officials in violation of the fourth amendment. We agree.

In *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), the Supreme Court invalidated a non-consensual, warrantless search of defendants' footlocker by federal agents. The Court explained that "warrantless searches of luggage or other property seized at the time of an arrest cannot be justified as incident to that arrest either if the 'search is remote in time or place from the arrest,' or no exigency exists." *Id.* at 15, 97 S.Ct. at 2485 (quoting *Preston v. United States*, 376 U.S. 364, 367, 84 S.Ct. 881, 883, 11 L.Ed.2d 777 (1964)).

■ Similarly, the officers' non-consensual, warrantless search of Grant's luggage in New York cannot be justified by Grant's detention, subsequent arrest, nor any exigent circumstances. The Government's appeal in this case is severely undermined by the fact that prior to conducting the search, Officer Sornberger contacted an assistant United States Attorney in Detroit who told him that he needed a search warrant to open the bag. *Grant*, 734 F.Supp. at 801. Ignoring this legal requirement, Officer Sornberger went ahead with the search; thus, violating Grant's fourth amendment rights. The Government now contends that Grant abandoned the luggage prior to the search. The district court found, however, that although he vacillated earlier in the morning, Grant acknowledged ownership of the luggage before 7:45 AM and the luggage did not arrive in New York until 8:30 AM. *See id.* Thus, at the time of the search, the officers in New York were fully aware that the luggage belonged to Grant, as he had claimed ownership. The Government's argument that the search was private is rebutted by the district court's finding that Officer Sornberger and a United States Customs Agent broke the lock; searched the luggage; and discovered the cans containing PCP. *See id.* Because Officer Sornberger directed and conducted the search of Grant's luggage in a joint endeavor with the Northwest supervisor, "the effect is the same as though he had engaged in the undertaking as one exclusively his own." *Byars v. United States*, 273 U.S. 28, 33, 47 S.Ct. 248, 250, 71 L.Ed. 520

(1927). *See also Lustig v. United States*, 338 U.S. 74, 78–79, 69 S.Ct. 1372, 1373–74, 93 L.Ed. 1819 (1949); *Corngold v. United States*, 367 F.2d 1, 6 (9th Cir.1966).

Because Grant had been arrested and there was no danger that the evidence would be lost or destroyed, there was no justification for the officers' failure to obtain a search warrant prior to searching the luggage and seizing the cans. *See United States v. Place*, 462 U.S. 696, 701–02, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983); *Payton v. New York*, 445 U.S. 573, 587, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980). After removing the cans from Grant's luggage, the officers placed them in a Northwest storage area, evidencing their apparent belief that there were no exigent circumstances to justify a warrantless search. Compare *United States v. Haley*, 581 F.2d 723, 726 (8th Cir.) (exigent circumstances found in the presence of a potential medical emergency), *cert. denied*, 439 U.S. 1005, 99 S.Ct. 618, 58 L.Ed.2d 681 (1978). Moreover, the testing of the contents of the cans was too extensive, as well as too remote in time and place from Grant's detention, to qualify as a "field test" exception to the warrant requirement of the fourth amendment. *See United States v. Jacobsen*, 466 U.S. 109, 125, 104 S.Ct. 1652, 1662, 80 L.Ed.2d 85 (1984). On these facts, we have concluded that the search of Grant's luggage was not a private search, but an impermissible public search conducted by Officer Sornberger and the customs agent.

### III.

We hold that because Grant was seized in violation of the fourth amendment, the evidence obtained during the Detroit search of his carry-on bag cannot be used against him. *See Wong Sun v. United States*, 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963). Similarly, because Grant's luggage was searched in violation of the fourth amendment, the evidence obtained during the New York search must also be suppressed. *See id.*

The Government finally argues that the district court erred in ordering Grant re-

leased on bond. Grant counters that the district court correctly set conditions for his release. *See Grant*, 734 F.Supp. at 803. However, because we affirm the district court's suppression order, the Government no longer has a case against Grant and the bond issue is moot. *See Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 1950, 23 L.Ed.2d 491 (1969); *Carras v. Williams*, 807 F.2d 1286, 1289 (6th Cir. 1986). *See also United States v. Dixon*, 787 F.2d 593 (6th Cir.1986) ("[O]nce this court decides the appellate issues [the] bond issue will be moot.").[4] *Cf. United States v. Peralta*, 849 F.2d 625, 626 (D.C. Cir.1988) (finding no cause to remand where the transcript clearly embodied the district court's reasons and findings for its detention decision).

For the foregoing reasons, the March 21, 1990 order suppressing evidence and March 8, 1990 order releasing Grant on bail entered by the Honorable Avern Cohn, United States District Court for the Eastern District of Michigan, are hereby AFFIRMED.

RALPH B. GUY, Jr., Circuit Judge, concurring in part and dissenting in part.

Because I believe that the conduct of the government in this case conformed to the requirements of the fourth amendment until the DEA agents conducted a full laboratory analysis on the cans without first securing a warrant, I am compelled to write separately. I agree with the conclusion of the majority that the PCP must be suppressed, but I would reverse the suppression order as to all other evidence seized.

As we stated in *United States v. Flowers*, 909 F.2d 145 (6th Cir.1990), there are three different levels of contact that occur between law enforcement officers and the travelling public. This case presents a progression from the lowest, most innocuous level of contact to the highest, most intrusive level.

In the first level of contact, a law enforcement officer approaches a person without any articulable reason whatsoever. As long as a reasonable person would feel free to leave the situation, no seizure has occurred within the meaning of the fourth amendment. *See Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). The contact rises to the second, somewhat more intrusive, level of contact when the person no longer feels free to go. This type of contact is commonly known as a *Terry* stop. So long as the agent has reasonable suspicion and so long as the detention of the traveller is limited, the fourth amendment is not offended. The final level of police-traveller contact occurs when the police have probable cause to believe a crime has been committed and that the person stopped committed the crime. In such situations, the police officer may, in fact, place the traveller under arrest, and he may conduct non-consensual searches of the person and his belongings. Even though he has probable cause, however, the government agent still must conduct his activities within the boundaries of the fourth amendment.

The majority merges its analysis of the two on-plane interrogations of the defendant by the agents. In my opinion, the two interrogations can and must be separated by the court in order to evaluate the fourth amendment implications of the case.

The initial approach of the defendant by the Border Patrol agents was within the first level of contact. The agents did not have reasonable suspicion to detain Grant; they were merely conducting a routine check of flight 338. Border Patrol agents routinely board flights in Detroit to check for illegal aliens. They are authorized by statute to board flights within a reasonable distance[5] of the international border. 8 U.S.C. § 1357(a)(3).

---

**4.** We recognize that the citation of unpublished per curiams is disfavored. We cite *Dixon*, however, because it establishes the law governing the present action and "there is no [Sixth Circuit] published opinion that would serve as well." *See* 6th Cir.R. 24(b).

**5.** 8 C.F.R. § 287.1(a)(2) defines "reasonable distance" to mean within 100 air miles of the border.

Looking at the totality of the circumstances, I am convinced that there was nothing improper about the first approach by the agents. The Border Patrol agents were dressed in civilian clothes, and their weapons were concealed. Although Buechner tapped Grant on the shoulder and showed him his badge, his overall manner was non-threatening. Most significantly, they did not restrict his movement, and they permitted him to move to a different seat, presumably to get away from them. In this case, not only would a reasonable person have felt free to leave, Grant did leave.

When the agents approached Grant for the second time and asked him to accompany them off the airplane, a seizure occurred. However, by this time, the agents had developed reasonable suspicion that Grant might be associated with criminal activity. First, the photograph on his green card did not really look like him, which led the agents to believe the card might be counterfeit. Second, his name was not on the flight manifest. Third, Grant was shaking as he handed his green card to Buechner. Fourth, Grant was unable to produce his plane ticket, saying that it was in his checked luggage. Although possible, it is highly improbable that someone would check his plane ticket in his suitcase. Finally, the agents had already discovered 55 illegal aliens on board.

Although each of these factors, in isolation, would be insufficient to give rise to reasonable suspicion, "articulable suspicion is to be based upon an assessment of *all* circumstances surrounding the actions of a suspected wrongdoer." *United States v. Knox*, 839 F.2d 285, 290 (6th Cir.1988), *cert. denied*, 490 U.S. 1019, 109 S.Ct. 1742, 104 L.Ed.2d 179 (1989). Taken together, the factors listed above gave rise to reasonable suspicion justifying a *Terry* stop of Grant.

Because the agents lacked probable cause at this point, the search of Grant's carry-on bag had to be with his consent in order to be legal. Although there was conflicting testimony at the evidentiary hearing, the magistrate concluded that Grant's consent to the search was voluntary. Because they found that the government's actions became illegal before this search, neither the district judge nor the majority ever made a specific finding of whether Grant gave his consent. The magistrate's conclusions were not clearly erroneous, and I would not disturb them. Consequently, the subsequent arrest and search-incident-to-arrest was legal, and all evidence seized up to this point is admissible.

The next question becomes whether the search of Grant's suitcase in New York was a valid private search, or whether it was illegal. The magistrate concluded that the search was private and therefore legal, but the district court and the majority concluded that, because the Port Authority officers had been advised to secure a warrant before opening the bag, their participation in the search of the bag at the direction of the Northwest agent was an impermissible government search. This conclusion blurs the distinction between a private and a government search. The fourth amendment only proscribes government action; it is wholly inapplicable to the actions, even if unreasonable, of private citizens, unless those citizens are acting as agents of the government. *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984).

The mere presence of law enforcement officers at a private search does not implicate the fourth amendment. Just as an illegal government search cannot be vindicated if the primary actor is a private citizen, a non-governmental search does not lose its private character simply because law enforcement officers perform tasks at the directive of a private citizen. In *United States v. Gomez*, 614 F.2d 643 (9th Cir.1979), for example, the Ninth Circuit held that a search was a valid, private one even though a police officer helped an airline supervisor open the defendant's suitcase. *See also United States v. Capra*, 501 F.2d 267 (2d Cir.1974), *cert. denied*, 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975).

Here, the Port Authority officers were merely assisting the Northwest service manager. LaGrone had a legitimate policy justification for opening the suitcase, because he suspected that the cans contained flammable materials. The search was legitimate, and the actions of the law enforcement officers were legal, even up to the point of opening the cans to sniff the contents.

The behavior of the law enforcement officers in this case became questionable, however, when the DEA seized the cans and took them to the laboratory to be analyzed. Clearly, the lab analysis went beyond the scope of the private search, as the private search merely disclosed the cans and the possibility that they might contain a flammable substance.

The government contends that the laboratory analysis made here was similar in nature to the field test that was approved by the Court in *Jacobsen*. In *Jacobsen*, the police officer conducted a field test on a small quantity of the white powder that had been discovered to determine whether the substance was cocaine. The Court held that such a field test did not compromise any legitimate privacy interest:

A chemical test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy. This conclusion is not dependent on the result of any particular test. It is probably safe to assume that virtually all of the tests conducted under circumstances comparable to those disclosed by this record would result in a positive finding; in such cases, no legitimate interest has been compromised. But even if the results are negative—merely disclosing that the substance is something other than cocaine—such a result reveals nothing of special interest. Congress has decided—and there is no question about its power to do so—to treat the interest in "privately" possessing cocaine as illegitimate; thus governmental conduct that can reveal whether a substance is cocaine, and no other arguably "private" fact, compromises no legitimate privacy interest.

*Jacobsen*, 466 U.S. at 123, 104 S.Ct. at 1661 (footnote omitted). The laboratory analysis conducted in this case clearly went beyond the scope of any field test envisioned by the Court in *Jacobsen*. The contents of the cans were subjected to a full battery of tests, which revealed not only whether the cans contained PCP, but also exactly what they did contain. The actions by the DEA at this point cannot be justified by *Jacobsen*.

At the point law enforcement officials seized the cans for testing, their activities rose to the third, and final, level of contact between the government and travellers. The laboratory testing constituted a search within the meaning of the fourth amendment, and it must be supported by probable cause and either a warrant or some exception to the warrant requirement.

The government argues that this case is controlled by this court's decision in *United States v. Rodriguez*, 596 F.2d 169 (6th Cir. 1979). In *Rodriguez*, an employee of Emery Air Freight opened a package and discovered that it contained a large, sealed plastic trash bag, inside of which were a number of transparent plastic bags containing a brown, powdery substance. There was also a lot of talcum powder loose in the larger trash bag. The employee contacted the police department, and the police officer ultimately took some of the powder back to a laboratory for testing. The testing revealed that the brown powder was PCP. The court determined that a government search and seizure had occurred, but that it was justified by the "plain view" exception to the warrant requirement. The court stated that "[a]n object in plain view may be inspected and seized without a warrant if (1) the officer is lawfully present, (2) the object is in plain view, and (3) its incriminating nature is immediately apparent." *Id.* at 175 (footnote omitted).

The instant case is distinguishable from *Rodriguez* because the incriminating nature of the cans was not immediately apparent. Although it was certainly unusual for someone to be carrying lacquer thinner or ether in a suitcase, such circumstances

do not lead inevitably to the conclusion that the cans contained contraband. By contrast, the incriminating nature of a parcel containing a number of small plastic bags full of brown powder is immediately apparent from plain view observation.

At the time the DEA seized the cans, the government had probable cause to believe that a crime had been committed. First, the circumstances surrounding Grant's ticket were suspicious. It was a one-way ticket, purchased with cash, in someone else's name. Such circumstances often accompany the purchase of tickets by drug couriers. In addition, he lied about the purchase of the ticket. He also lied about the contents of the cans. He was carrying marijuana on his person, which constituted evidence of his association with illegal drugs. Finally, the fact that the cans contained a liquid that smelled like ether indicated that the cans might contain PCP.

Given that probable cause existed, there is no reason why the agents could not have obtained a warrant before seizing and testing the contents of the cans. The cans were securely stored at LaGuardia Airport by Northwest Airlines. The defendant could not have appeared to claim them, as he was in custody in Detroit.

As this court recently reiterated, "[w]arrantless searches are *per se* unreasonable under the fourth amendment, except in a few carefully delineated instances. The exigent circumstances exception relies on the premise that the existence of an emergency situation, demanding urgent police action, may excuse the failure to procure a search warrant." *United States v. Radka,* 904 F.2d 357, 360 (6th Cir.1990) (citations and footnote omitted). No such emergency situation existed in this case, and there was no need for urgent police action.

The seizure of the cans and the laboratory analysis of their contents without first securing a warrant violated Grant's fourth amendment right to be free from unreasonable searches and seizures. I would affirm the suppression of the cans.

I also concur in the conclusion of the majority that the bond issue is moot.